**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ALPHA PRO TECH, INC.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **VWR INTERNATIONAL LLC,** | : | **No. 12-1615** |
| **Defendant.** | : | |

**M E M O R A N D U M**

PRATTER, J.                                                        NOVEMBER 25, 2013

VWR International LLC ("VWR") moves to dismiss (Docket No. 29) Alpha Pro Tech,

Inc.'s ("APT") Second Amended Complaint ("SAC," Docket No. 28). For the reasons that

follow, the Court will grant the motion in part and deny it in part.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**[1]

As APT alleges in its Second Amended Complaint, "this action is about two things:

VWR improperly obtained [APT's] trade secrets while in a position of trust and confidence with

[APT]; and VWR falsely and misleadingly advertised its products to [APT's] customers." SAC

¶ 7. APT manufactures disposable protective apparel for use in scientific laboratories and

medical settings and sells its products through distributors such as VWR. APT has branded one

of its product lines with its CRITICAL COVER® registered trademark, to which it owns all the

---

[1] The following summary is based on the allegations in APT's Complaint, which the Court
assumes to be true for purposes of adjudicating VWR's Motion to Dismiss. *See Ashcroft v. Iqbal*,
556 U.S. 662, 679 (2009).

APT is an Oklahoma corporation with its principal place of business in Arizona. VWR is a
Delaware corporation with its principal place of business in Pennsylvania. Thus, there are two
bases for jurisdiction: federal question jurisdiction for APT's Lanham Act claims (15 U.S.C.
§ 1125(a)), with supplemental jurisdiction over APT's state law claims under 13 U.S.C. § 1367,
as well as diversity jurisdiction.

rights. The manufacture of these products involves a method of covering spun bond polypropylene ("SBP") fabric with a combination of synthetic polymers; at issue here is APT's proprietary "coated SBP method," which produces a coating superior to that found in products available elsewhere on the market. Whereas environmental stress (e.g., from wear or friction) would often cause competitors' SBP coatings to delaminate and flake off—an unwelcome result in the manufacturing, scientific, and medical environments in which such protective garments are worn—APT's proprietary SBP coating method is more durable and produces fewer particulate flakes. APT developed its particular coating method in or around 1995 after about a year and a half of, and significant sums expended on, testing multiple polymer and SBP combinations until it "successfully determined a particular combination not previously used in the protective apparel industry that provided a superior Coated SBP product." SAC ¶ 17.

Because APT's method was superior, its process gave it a competitive business advantage over competitors whose products had less effective coatings. Its products have been successful and consumers accordingly afford the CRITICAL COVER® "brand substantial goodwill." SAC ¶ 23. The value of a brand's goodwill is substantial in this market because many customers of such protective apparel require a qualification process in their clean environments that, for some larger customers, can be time- and resource-intensive. Further, to maintain the high quality of its CRITICAL COVER® line, APT guaranteed its products' performance on the products themselves and in their accompanying literature, and also maintained quality control teams at its production site.

APT's method and formula were not generally known to the public and APT took steps to protect the formula, which, it contends, is a trade secret. APT "required its employees and independent contractors working directly with the formula and method to maintain their secrecy

pursuant to written and oral agreements," SAC ¶ 20; it also included confidentiality clauses in its contracts with distributors.[2]

In 1996, APT and VWR entered into an agreement, created by two documents, a Distribution Contract and an Operations Document (SAC, Exs. B & C, respectively), pursuant to which VWR would serve as APT's exclusive distributor of APT's CRITICAL COVER®– branded products. Pursuant to this agreement, APT granted VWR an exclusive license to use the CRITICAL COVER® trademark and prepared promotion literature for VWR to use. The agreement also bound VWR to identify APT as the manufacturer and warrantor of the CRITICAL COVER® products in its product labeling and online and printed literature. Also pursuant to their agreement, APT referred CRITICAL COVER® purchase orders to VWR. And, as discussed in greater detail below, the parties' agreement bound the parties not to use, publish, or disclose information conferred, pursuant to the agreement, by one upon the other, or by a third party with a confidentiality agreement with one of the parties.[3] VWR was APT's sole CRITICAL COVER® distributor in the United States and thus depended wholly upon VWR for its sales. Both parties profited from the arrangement for over a decade.

In 2000, APT decided to move its CRITICAL COVER® manufacturing from the state of Georgia overseas to China, where it entered into a relationship with Xiantao Xinfa Plastics Company, Ltd. ("XXPC"), which was to become APT's new CRITICAL COVER®

---

[2] VWR contends that it was the only distributor with which APT contracted, but whether that contention is true is, for the reasons discussed below in section III.B, immaterial.

[3] The parties dispute the scope of the exclusive distributorship agreement, but to the extent that the scope of the contract language is determinative, it is discussed below in section III.B.

In addition, VWR contests that APT was ever identified, at least prominently, in its promotional literature, but, for the reasons discussed below in section III.E, the issue is not determinative, at least at this stage.

manufacturer. At the outset of the APT–XXPC relationship, only APT possessed the information necessary to utilize APT's coated SBP method. Before teaching XXPC employees its method, APT extracted an oral confidentiality agreement with XXPC and its owner, Mr. Fu Lixin ("Mr. Fu"), to maintain the confidentiality of APT's formula and not use it for other customers. And although APT shared its method and formula with XXPC, APT remained CRITICAL COVER®'s manufacturer, albeit in XXPC's plant and with its personnel, by continuing to provide all the raw materials (including the necessary polymers embodying the clandestine method—at first, APT simply provided the polymers without giving XXPC their names) and monitoring the use of raw materials and polymers with a gravimetric blender (APT kept a supervisory and quality-control team on site). Pursuant to the APT–XXPC oral agreement, the relationship was at-will but the parties understood that the formula, raw materials, and certain equipment remained APT's property and that Mr. Fu and XXPC could not use APT's method outside of XXPC's manufacturing relationship with APT even after the parties' relationship might come to an end.

Sometime in 2009 or thereafter, VWR recognized that it could capture some of APT's profitability for itself if it could compete with APT. But instead of developing its own products or attempting to reverse engineer the CRITICAL COVER® coated SBP method—and then qualifying its new products with demanding customers already using CRITICAL COVER® products they had put through the paces—VWR "sought to obtain from [APT] the composition and identity of materials used in [APT's] Coated SBP and the identity of [APT's] Chinese manufacturing plant." SAC ¶ 50. After APT communicated to VWR that the majority of this information was confidential and proprietary, VWR unleashed its own efforts to locate APT's Chinese manufacturer, and it eventually found XXPC and met with Mr. Fu in or around August

2009 to discuss XXPC's possible manufacturing of the equivalent of APT's CRITICAL

COVER® products for VWR. And despite knowing that XXPC and APT had an agreement

respecting confidentiality, APT alleges, "VWR induced XXPC and Mr. Fu to violate those

confidentiality restrictions by manufacturing Coated SBP and Coated SBP-containing apparel for

VWR using [APT's] proprietary formulae and methods." SAC ¶ 55. At the same time, VWR

kept APT in the dark by pretending to renegotiate its contract with APT while in actuality

making preparations to release its competing products embodying APT's method and formula.

VWR then notified APT that it would not continue the parties' relationship.

Then, APT alleges, VWR set out to market its new product lines as replacements for, but

nonetheless continuations of, APT's CRITICAL COVER® products. Through its marketing and

promotional materials, VWR was able to induce its customers, who had brand loyalty to APT's

CRITICAL COVER® products, which these customers had qualified as meeting the requirements

of their environments, to believe CRITICAL COVER® products no longer existed and that they

were simply being transitioned into the same or similar products by another name—supposedly

VWR's knock-offs produced by XXPC. Through a number of statements, VWR was able to

convince consumers that the change in products was in name only. Some statements, APT

contends, were false, while others were technically true but misleading nonetheless. For instance,

APT contends that VWR's statements in one of its marketing materials that, for example, "VWR

Advanced and Maximum Protection apparel (the products formerly known under the VWR

Critical Cover ComforTech™ and Microbreathe™ brands) will experience a change in raw

materials," SAC Ex. F, at 1 para. 4; SAC ¶ 70, are misleading because "VWR's statements . . .

were 'not formerly known under' [APT's] trademark," and/or they "lead[] consumers to believe

that the source of the VWR products is the same as that of [APT's] CRITICAL COVER®

products." SAC ¶ 70. Further examples are provided where relevant in the discussion below.

*     *     *

APT sued VWR on March 30, 2012. It brought claims of false designation of origin and false advertising under the Lanham Act, 15 U.S.C. § 1125(a); trade dress infringement in violation of section 43(a) the Lanham Act, § 1125(a); willful misappropriation of trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Cons. Stat. Ann. §§ 5301–5308; and tortious interference with APT's existing contractual relationship with XXPC. After VWR moved to dismiss, APT filed its first amended complaint, thereby mooting VWR's motion to dismiss. VWR then moved to dismiss APT's amended complaint, and following the parties' briefing, the Court heard oral argument. APT then sought leave to file its Second Amended Complaint, which is currently before the Court as the target of VWR's subsequent Motion to Dismiss.

In its Second Amended Complaint (Docket No. 28), APT brings claims under five counts: Count I, for VWR's alleged willful misappropriation of trade secrets under PUTSA for what APT avers was VWR's acquisition and use in manufacture of APT's coated SBP method and formula, which, APT contends, are trade secrets; Count II, for breach of the APT–VWR contract—in particular, its confidentiality provision; Count III, for VWR's unjust enrichment in retaining the benefit of APT's coated SBP method; Count IV, for VWR's tortious interference with APT's oral contract with XXPC; and Count V, for false designation of origin and false advertising under the Lanham Act for VWR's statements promoting its new line of products.

With its Motion to Dismiss (Docket No. 29), VWR tests the sufficiency of all five counts of the Second Amended Complaint. Regarding Count I, VWR disputes that APT's coated SBP

6

method was a trade secret at the time of the alleged misappropriation. Second, VWR argues that it did not breach its contract with APT (Count II) because the confidentiality provision in the agreement applies only to information transmitted from one party or party's confidential promisee to the other party pursuant to the agreement, and the alleged theft of trade secrets at the root of this dispute occurred outside the canopy of the parties' agreement. Third, VWR disputes that APT can pursue its unjust enrichment claim because, inter alia, a claim for unjust enrichment, as a quasi-contract cause of action, may not lie where the parties have a contract, and thus Count III conflicts with Count II. VWR also raises other supposed pleading deficiencies with regard to the unjust enrichment claim. Next, VWR contends that APT's tortious interference claim must fail not only because APT has failed to state a tortious interference cause of action, but also because such a tortious cause of action is barred by the economic loss and gist of the action doctrines. Finally, VWR contests the sufficiency of APT's Lanham Act claims. VWR also argues that Counts I, III, and IV should be dismissed for APT's failure to join XXPC as a necessary party pursuant to Federal Rule of Civil Procedure 19.

For the reasons that follow, the Court will grant VWR's Motion to Dismiss with respect to Counts II and IV (breach of contract and tortious interference with contract) and deny it with respect to Counts I, III, and V (misappropriation of trade secrets; unjust enrichment; and Lanham Act false designation of origin and false advertising).[4]

---

[4] As explained below, the motion to dismiss stage is generally not the appropriate juncture at which to raise arguments about the inconsistency of various causes of action because the Federal Rules permit pleading in the alternative. Still, PUTSA's preemption of many common law causes of action when trade secrets are at issue is one of the factors undercutting APT's tortious interference claim, and it also means that, if APT's PUTSA claim survives, its unjust enrichment claim must not. VWR raised the preemption issue in its prior motion to dismiss; although it did not renew it in the instant Motion to Dismiss, presumably as a strategic choice so as not to concede the presence of trade secrets, APT has been put on notice. *See* VWR Prior Mot. Dismiss at 24 n.9 (Docket No. 20) (raising this bar). But that issue, like others amid APT's surviving claims, is a question for another day.

## II.       STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Although Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted) (alteration in original), the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," *id.*

To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2011) (citation and internal quotation marks omitted). Thus, assessment of the sufficiency of a complaint is "a context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *see also Twombly*, 550 U.S. at 555 (stating that courts must "assum[e] that all the allegations in

the complaint are true (even if doubtful in fact)"); *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("[A] court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."). Also, the Court must accept as true all reasonable inferences emanating from the allegations, and view those facts and inferences in the light most favorable to the nonmoving party. *See Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989); *see also Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010). That admonition does not demand that the Court ignore or discount reality. The Court "need not accept as true unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000) (citations and internal quotation marks omitted), and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678; *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (explaining that a court need not accept a plaintiff's "bald assertions" or "legal conclusions" (citations omitted)). Finally, "if a [claim] is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d. Cir. 2008).

III.    **DISCUSSION**

APT brings claims for misappropriation of trade secrets under the Pennsylvania Uniform Trade Secrets Act (Count I), breach of contract (Count II), unjust enrichment (Count III), tortious interference with an existing contractual relationship (Count IV), and Lanham Act false

advertising and false designation of origin (Count V). VWR disputes each of these claims with a variety of arguments, and also argues that Counts I, III, and IV cannot proceed without XXPC, which, VWR avers, is a necessary party that must be joined pursuant to Federal Rule of Civil Procedure 19. XXPC is not presently a party in this case.

A.   **Misappropriation of Trade Secrets in Violation of the Pennsylvania Uniform Trade Secrets Act (Count I)**

APT claims that VWR willfully misappropriated its coated SBP method and formula from XXPC and that because this method and formula constitute trade secrets, VWR is liable to it for willful misappropriation of trade secrets under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Cons. Stat. Ann. §§ 5301–5308. PUTSA permits a plaintiff to recover monetary "damages for misappropriation" of a trade secret, *id.* § 5304; *see id.* § 5302 (definitions). Under the statute, a trade secret consists of

> [i]nformation, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
>   (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
>   (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* § 5302. To make this determination, Pennsylvania courts look to a variety of factors:

> (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others.

*Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010); *see also Nova Chems.,*

*Inc. v. Sekisui Plastics Co., Ltd.*, 579 F.3d 319, 327 (3d Cir. 2009).[5]

PUTSA provides that misappropriation of a trade secret can occur through:

(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) *disclosure or use of a trade secret of another without express or implied consent by a person who:*

(i) used improper means to acquire knowledge of the trade secret;

(ii) *at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:*

(A) derived from or through a person who had utilized improper means to acquire it;

(B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(C) *derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use*; or

(iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 Pa. Cons. Stat. Ann. § 5302 (emphasis added). APT argues, first, that its coated SBP method

and formula are trade secrets and, second, that VWR misappropriated them in such a way as to

fall within the italicized language above. VWR disputes both contentions.

### 1. Whether APT's Coated SBP Method and Formula Constitute Trade Secrets

VWR begins by contending that this Court should dismiss Count I for its alleged

misappropriation of APT's trade secrets because "no discovery could establish that the

information at issue could achieve trade secret status." VWR Mot. Dismiss at 12. VWR has

---

[5] PUTSA is a relatively young statutory creature, and Pennsylvania courts continue to look to pre-PUTSA case law interpreting the *Restatement (First) of Torts* § 757 cmt. b for guidance on determining whether information constitutes a trade secret. *Nova Chems.*, 579 F.3d at 327 n.12; *see also Bimbo Bakeries*, 613 F.3d at 109 n.7.

correctly summarized the standard to the extent that this statement recognizes that "[w]hether information rises to the level of a trade secret under PUTSA is a question of fact not appropriate for resolution on a motion to dismiss." *Synthes, Inc. v. Emerge Med., Inc.*, No. 11-1566, 2012 WL 4205476, at *27 (E.D. Pa. Sept. 19, 2012) (citing cases); *see also, e.g.*, *Ideal Aerosmith, Inc. v. Acutronic USA, Inc.*, No. 07-1029, 2007 WL 4394447, at *8 (E.D. Pa. Dec. 13, 2007). Nonetheless, VWR argues that APT has failed to state a claim by arguing that APT has "baldly state[d]," without providing any factual content, the time and effort it spent to develop its coated SBP method, such that it is unclear "whether [APT's] alleged trade secret would take years or perhaps just minutes to reverse engineer"; moreover, VWR argues, APT "never explains how [its coated SBP method and formula] provided it with a competitive business advantage." VWR Mot. Dismiss at 13-14.

VWR's contentions pay lip service to the motion to dismiss standard—a theme all too prevalent throughout VWR's Motion to Dismiss. Like most other causes action, "a claim for misappropriation of trade secrets need not be pleaded with particularity." *Ctr. Pointe Sleep Assocs., LLC v. Panian*, No. 08-1168, 2009 WL 789979, at *3 (W.D. Pa. Mar. 18, 2009). What VWR really wants, it seems, is evidence. However, concrete evidence is not required until VWR moves for summary judgment or the case proceeds to trial. And in actuality, such a requirement, even if it existed, would make less sense here, where trade secrets are concerned because "such a requirement would result in public disclosure of the purported trade secret." *Pennfield Precision, Inc. v. EF Precision, Inc.*, No. 00-280, 2000 WL 1201381, at *4 (E.D. Pa. Aug. 15, 2000) (quoting *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 755 F. Supp. 635, 636 (D. Del. 1991)).

For now, APT has adequately pleaded that its SBP method was a trade secret:

- APT has pleaded a "formula, . . . method, technique or process," 12 Pa. Cons. Stat. Ann. § 5302, in the form of its "better chemical composition of polymers for the purposes of

creating coated spun bond polypropylene with a high coefficient of friction and a low level of particulates," SAC ¶ 16;

- APT has pleaded that this "particular combination [was] not previously used in the protective apparel industry," SAC ¶ 17—an allegation responsive to the requirement that the information "[d]erives independent economic value . . . from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," 12 Pa. Cons. Stat. Ann. § 5302, or the factor regarding "(1) the extent to which the information is known outside of the company's business," *Bimbo Bakeries*, 613 F.3d at 109;

- APT has pleaded that it "ex[p]ended significant time, effort, and expense to develop [these] proprietary formulations and methods," SAC ¶ 18—an allegation responsive to the requirement that the information "not be[] readily ascertainable by proper means," 12 Pa. Cons. Stat. Ann. § 5302;

- APT has pleaded that it spent "twelve to eighteen months . . . testing several different polymers and then testing approximately twelve combinations and blends of the selected polymers" to "successfully determine[] a particular combination," SAC ¶ 17—an allegation providing information regarding "(5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others," *Bimbo Bakeries*, 613 F.3d at 109;

- APT has pleaded explicitly that its "proprietary formulations and methods for making Coated SBP, *i.e.*, the particular combination and quantity of polymers and particular method of application to the SBP fabric, were not generally known to the public prior to their development by [APT]," SAC ¶ 19; and

- APT has pleaded facts regarding its SBP method's "value . . . to the company and its competitors," *Bimbo Bakeries*, 613 F.3d at 109; *see also* 12 Pa. Cons. Stat. Ann. § 5302, by stating the inadequacies of other SBP methods: "Stress on the coated fabric (for example, from wear) causes the coating layer to delaminate and eventually flake off of the fabric. Delamination and flaking results in particulate contamination in the clean room, an undesirable result." SAC ¶ 15. By contrast, APT's coated SBP method produces a "product [that] is more durable and results in fewer particulates," SAC ¶ 17; *see also* SAC ¶ 21, and has therefore made APT's "line of products . . . wildly successful, and relevant consumers afford [APT's] products and brand substantial goodwill," SAC ¶ 23, because, unlike competitors' products, APT's "products were qualified for use in many of its customers' clean room environments," SAC ¶ 24.

But even if all those things are true, VWR continues, APT's coated SBP method cannot

be a trade secret for the further reason that APT fails to satisfy the second prong of section

5302's requirement that the information be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 12 Pa. Cons. Stat. Ann. § 5302. Indeed, two of the factors that courts look at are "(2) the extent to which the information is known by employees and others involved in the company's business" and, more to the point here, "(3) the extent of the measures taken by the company to guard the secrecy of the information," *Bimbo Bakeries*, 613 F.3d at 109. And all that APT allegedly did, says VWR, was enter into an oral confidentiality agreement with XXPC—about which, moreover, it has alleged insufficient facts—and this agreement, even if it existed, does "not qualify as 'reasonable efforts' to maintain the secrecy of [APT's] propriety formulations and methods." VWR Mot. Dismiss at 15.

But whether that is the case remains to be seen. Whether APT's efforts were reasonable is, to a large extent, a question of fact that cannot be answered at this stage. The Court does not have the necessary factual array before it to determine whether VWR's contention is correct, and the determination of whether a plaintiff's efforts to maintain the secrecy of its alleged trade secrets were reasonable is not a question susceptible of black-or-white analysis. As the Pennsylvania courts have explained, "the determination of whether the information is a trade secret must be made on a case-by-case basis." *O.D. Anderson, Inc. v. Cricks*, 815 A.2d 1063, 1071 (Pa. Super. Ct. 2003). For one, "what is required to maintain a trade secret action is not absolute secrecy"—but for the breach of which, one supposes, as a matter of logic, the circumstances would never give rise to actionable misappropriation of trade secrets—"but rather substantial secrecy." *EXL Labs., LLC v. Egolf*, No. 10-6282, 2010 WL 5000835, at *5 (E.D. Pa. Dec. 7, 2010) (citing *O.D. Anderson*, 815 A.2d at 1070). And ascertaining "whether a plaintiff took sufficient steps to maintain substantial secrecy of its proprietary information" requires consideration of, but not entire reliance on, confidentiality agreements, which are but one factor

14

of the analysis. *Id.* at *6; *accord Swift Bros. v. Swift & Sons, Inc.*, 921 F. Supp. 267, 277 (E.D. Pa. 1995) ("Such agreements are not necessary in every case, however, if the other precautions taken by the plaintiff are sufficient.").

VWR's citation to secondary material hardly helps to resolve this issue. First, to the extent that evaluation of a plaintiff's efforts to maintain the secrecy of its alleged trade secrets is a factbound inquiry that must be determined on a case-by-case basis, resort to secondary literature is appropriate only for the purpose of painting the background scenery rather than for stacking the building blocks of a holding. *See generally, e.g.*, Richard A. Posner, *Reflections on Judging* 136-38 (2013). The issue here is not the rule for the determination of what constitutes reasonable efforts, but instead its application to a particular set of circumstances. Thus, legislative facts—such as those that might be provided in the secondary literature—are of little relevance; instead, the adjudicative facts must be determined by proof to the finder of fact and from them the issue of trade secret *vel non* decided.

And second, even if resort to the secondary literature cited were otherwise appropriate, those articles merely establish what *Chinese*, rather than *Pennsylvania*, law might require,[6] *see* J. Benjamin Bai & Guoping Da, *Strategies for Trade Secrets Protection in China*, 9 Nw. J. Tech. & Intell. Prop. 351, 71 (2011) ("*Chinese law* permits companies to contractually protect their trade secrets. Due to the high evidentiary burden *in China*, written agreements are vital in protecting

---

[6] Notwithstanding certain suggestions that the law of a jurisdiction other than Pennsylvania might apply to this case, the Court will apply Pennsylvania law. In the first time the parties locked horns at the motion to dismiss stage, the parties agreed that Pennsylvania law should govern. *See* VWR Prior Mot. Dismiss at 18 n.7 (Docket No. 20) ("[F]or purposes of this motion VWR assumes Pennsylvania law applies."). Moreover, the Court will not entertain casual comments that Chinese law should apply; not only is VWR's principal place of business in Pennsylvania (and thus Pennsylvania is likely the relevant locale for its allegedly wrongful accrual of benefits for choice of law purposes), but the parties have not seriously entertained the suggestion themselves—a further reason sua sponte application of Chinese law would be inappropriate.

trade secrets and confidential information." (emphasis added)); Marisa Anne Pagnattaro, *Protecting Trade Secrets in China: Update on Employee Disclosures and the Limitations of the Law*, 45 Am. Bus. L.J. 399, 413 (2008) (both cited in VWR Mot. Dismiss at 15); and that even where written agreements with Chinese businesses regarding trade secrets exist, they "may be poorly enforced," such that the better strategy may be to "limit access to trade secret information to key personnel having a legitimate interest in knowing the information," Patricia E. Campbell & Michael Pecht, *The Emperor's New Clothes: Intellectual Property Protections in China*, 7 J. Bus. & Tech. L. 69, 113 (2012) (relying, inter alia, on Pagnattaro, *Protecting Trade Secrets in China*, *supra*) (cited in VWR Mot. Dismiss at 15-16). The flipside of these observations in the literature, such as the statement in *The Emperor's New Clothes* that written agreements may be poorly enforced, is that companies like APT take Chinese companies and the Chinese culture as they find them, such that even written agreements may be insufficient to prevent disclosure of trade secrets. The import of these observations is hardly the stuff of case-by-case adjudication. And the thrust of the reasoning in those articles, moreover, is that written agreements inherently provide documentary *evidence* of their existence. Whether APT can fulfill *its ultimate burden* of proving reasonable efforts to maintain the secrecy of its coated SBP method may well depend on whether it can show, as an evidentiary matter, that it did in fact enter into a confidentiality agreement (albeit an oral one) with XXPC. But what APT can show, and with what evidence, are not matters for the motion to dismiss stage.

In sum, the Court cannot decide at this juncture whether APT's efforts, if they were sufficiently pled, were reasonable. VWR's cannot establish that APT's efforts were insufficient

as a matter of law, for VWR has not cited a single case establishing that oral confidentiality agreements are per se unreasonable or unenforceable. This Court will not invent such a rule.[7]

Instead, APT has alleged that it took efforts, which could be found to be reasonable, to protect its trade secret by pleading that:

- APT "required its employees and independent contractors working directly with the formula and method to maintain their secrecy pursuant to written and oral agreements." SAC ¶ 20;
- APT "required distributors to maintain the secrecy of any confidential information learned from [APT] or from a third party subject to a confidentiality agreement with [APT]." SAC ¶ 20;
- APT required VWR to maintain the confidentiality of such information, SAC ¶ 32 (citing the parties' contract at ¶ 9, SAC Ex. B);[8]
- "Prior to disclosing any formulae or methods, [APT executive Danny] Montgomery and Mr. Fu [for XXPC] entered into the [APT]–XXPC confidentiality agreement pursuant to which XXPC agreed to maintain the confidentiality of [APT's] trade secrets and not to use them for other customers." SAC ¶ 40;

---

[7] VWR comes closest in its citation to *Smith v. Mid-State Nurses, Inc.*, 403 S.E.2d 789 (Ga. 1991), which, it argues (notwithstanding the case's "different procedural posture") "undoubtedly stands for the proposition that oral instructions to maintain confidentiality of a purported trade secret—like those described by [APT] in the SAC—are simply not reasonable efforts to maintain the confidentiality of the trade secret," VWR Reply at 4 (citing *Smith*, 403 S.E.2d at 790). But even if *Smith* were controlling on this Court—and, as a Georgia case interpreting a different law, it is not—it would be distinguishable, if not only for its procedural posture, but also in the paucity of evidence and the fact that oral instructions, rather than an oral confidentiality agreement, were at issue (not to mention any differences the Chinese context may entail).

By contrast, APT cites to some cases suggesting that an oral agreement may be enough. *See, e.g.*, *Flynn v. Health Advocate, Inc.*, No. 03-3764, 2004 WL 51929, at *11 (E.D. Pa. Jan. 13, 2004); *EXL Labs.*, 2011 WL 880453, at *6 (discussing duty rather than reasonableness of efforts, but finding oral instructions to board members not to "divulge Plaintiff's proprietary information to third parties," even in the absence of "sign[ed] confidentiality agreements," sufficient (citing *Swift Bros.*, 921 F. Supp. at 277 ("The defendants assert that the plaintiff had no confidentiality agreements with its employees to protect its customer information. Such agreements are not necessary in every case, however, if the other precautions taken by the plaintiff are sufficient."))).

[8] The fact that the confidentiality provision in APT and VWR's contract does not cover the alleged misappropriation, *see infra* Section III.B, does not logically compel the conclusion that the confidentiality provision cannot form a part of what, taken together, are reasonable efforts to maintain the secrecy of the method and formula.

17

- "[A]t the outset of the [APT]–XXPC manufacturing relationship, [APT] declined to provide XXPC with the names of the polymers used in the formula." SAC ¶ 41;
- APT "was able to precisely monitor the [XXPC] plant's use of the trade secret components through use of an [APT]-provided gravimetric blender." SAC ¶ 42; and
- Pursuant to the APT–XXPC relationship, "the parties agreed that the Coated SBP formulae, raw materials, and certain equipment provided by [APT] and required for the manufacturing process were the exclusive property of [APT], and that neither XXPC nor Fu individually were permitted to use or trade on that information or property following the determination of the parties' relationship." SAC ¶ 43.

Whether or not these efforts were reasonable, APT may well face significant evidentiary problems establishing preliminarily that any such oral agreement existed between it and XXPC. But these are two separate, albeit conceptually related, issues, and they, too, are questions for another day.

## 2.   Whether VWR Misappropriated APT's Coated SBP Information

VWR argues next that the "Second Amended Complaint does not establish that any alleged trade secret was communicated to VWR while it was in a position of trust and confidence and under such circumstances giving rise to a duty to maintain its confidentiality"—primarily, VWR suggests, because the alleged communication of the coated SBP method information came from a third party, XXPC, rather than from APT. VWR Mot. Dismiss at 17-18.

PUTSA provides that the conduct considered misappropriation includes *both* (1) the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means," 12 Pa. Cons. Stat. Ann. § 5302, *as well as*

> (2) disclosure or use of a trade secret of another without express or implied consent by a person who:
>
> . . .
>
> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>
> . . .

> (C) derived from or through a person who owed a duty to the person
> seeking relief to maintain its secrecy or limit its use . . . .

12 Pa. Cons. Stat. Ann. § 5302. Under the latter option, a plaintiff can prevail on a

misappropriation claim if it can show that the defendant used a trade secret without consent and,

at the time of its use, knew *or had reason to know* that the trade secret was derived from a third

party owing the plaintiff a duty of secrecy. *Id.* § 5302(2)(ii)(C).[9]

Under this standard, APT has sufficiently pleaded a claim for misappropriation:

- APT pleaded that it put VWR on notice that its information was proprietary when, "[o]n several occasions in late 2007 and 2008, VWR sought to obtain from [APT] the composition and identity of materials used in [APT's] Coated SBP and the identity of [APT's] Chinese manufacturing plant." SAC ¶ 50; *see also* SAC ¶ 51. APT did not provide this information, but instead simply informed APT that all information, beyond the country of origin of its raw materials, "was proprietary in nature." SAC ¶ 50;
- APT had an oral confidentiality agreement with XXPC. SAC ¶¶ 40, 43;
- VWR itself was bound by a confidentiality agreement with APT. *See* SAC ¶ 32; Ex. B;
- VWR managed to identify XXPC and Mr. Fu and enter into an agreement that XXPC would manufacture the same products for VWR. *See* SAC ¶¶ 52-53; and
- VWR knew that XXPC and APT had a confidentiality agreement and it induced XXPC to violate it. SAC ¶¶ 54-55.

Still, VWR argues that APT has not sufficiently alleged that VWR acquired any alleged

trade secrets by improper means or that it knew about XXPC's alleged duty of secrecy arising

from the alleged oral confidentiality agreement between APT and XXPC. *See* VWR Reply at 5-

6. Paragraph 54 of the SAC may be conclusory and simply alleging that VWR knew of the

agreement may not be enough. But even without that allegation, APT has stated a claim because

its other allegations permit the reasonable, and plausible, inference that VWR had reason to

know, even if it did not in fact know, that XXPC might have a confidentiality agreement with

---

[9] Section 5302 has a possibly confounding numbering system: there are two 5302(1)'s and 5302(2)'s, each under a different term defined by the section, but the numbers cited above will nonetheless be of aid to the reader.

APT. Indeed, the gravamen of the other allegations set out above is that VWR knew that the SBP

method was proprietary and that it was secret because, notwithstanding APT and VWR's

distribution relationship, APT would not disclose the composition or identity of the materials or

even the identity of the XXPC plant. APT's confidentiality agreement with VWR, as well as its

refusal to give VWR more information, would be enough to give VWR its reason to know. This

may well be enough for present pleading purposes, subject to one last issue raised by VWR to

challenge Count I.

### 3.   Whether VWR "Used" a Trade Secret

In its final attempt to knock out Count I, VWR contends that APT relies only "on

information and belief" for its bare allegation that VWR used APT's trade secrets by embodying

them in VWR's products. *See* VWR Mot. Dismiss at 18. VWR argues that APT has pleaded "no

facts to show that XXPC actually gave [any trade secrets] to VWR," as opposed to "using XXPC

to manufacture [VWR's] own line of protective apparel." *Id.* Further, VWR argues, APT

"specifically acknowledged in its Response that VWR may not have known that [APT's]

formulations for making Coated SBP were 'trade secrets *per se*.'" VWR Reply at 6 (quoting

APT Resp. at 15).

As a preliminary matter, logically, following a method or formula to manufacture a

product is "using" that method or formula, and all that PUTSA requires is "use," 12 Pa. Cons.

Stat. Ann. § 5302. Second, even if APT's allegation that, "On information and belief, VWR's

final products embodied [APT's] misappropriated trade secrets for Coated SBP," SAC ¶ 59,

other of APT's allegations allow the plausible inference that XXPC was using APT's trade secret

method to manufacture VWR's new line of products. *See, e.g.*, ¶ 70 (reporting VWR's statement

that "we have not changed . . . the manufacturing process for 95% of the products in our new

line"); SAC ¶¶ 53-56 (establishment of VWR's arrangement with XXPC); ¶ 71 (charts implying

that the only change in products from APT's to VWR's was one of name).

Finding that APT has properly alleged use is consistent with the result in *Synthes, Inc. v.*

*Emerge Medical, Inc.*, 2012 WL 4205476, at *29, in which that court found that the plaintiffs

had stated a claim under PUTSA where much of their allegations were skeletal and based

"[u]pon information and belief." VWR's attempt to distinguish *Synthes* on the ground that "the

Complaint in *Synthes* was more factually robust than Alpha's SAC," VWR Reply at 6, is

unavailing. That the *Snythes* complaint alleged that the *Synthes* defendants knew at the time of

their alleged use of plaintiff's alleged trade secret that that information was in fact a trade secret

is not determinative. Not only did APT not concede that VWR did not know that APT's SBP

method was a trade secret at the time VWR used the method—"[e]ven if" is not the language of

concessions, *see* APT Resp. at 15—APT has also pleaded allegations sufficient to meet

PUTSA's actual requirement, which is not a specific intent to steal trade secrets with the

knowledge that they are trade secrets as a matter of law, but knowledge or a reason to know that

the information was confidential. *See* 12 Pa. Cons. Stat. Ann. § 5302; *see also Restatement*

*(First) of Torts* § 757 illus. 3-4.[10]

---

[10] If the Pennsylvania legislature intended such a specific intent to apply under section
5302(2)(ii)(C), its inclusion of language with such a specific requirement only in section
5302(2)(iii) is a strange choice. *Cf., e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law: The*
*Interpretation of Legal Texts* canons 10, 25-26 (2012) (canons of negative implication,
presumption of consistent usage, and against surplusage). *Compare* 12 Pa. Cons. Stat. Ann.
§ 5302(2)(iii) ("before a material change of his position, *knew or had reason to know that it was*
*a trade secret* and that knowledge of it had been acquired by accident or mistake" (emphasis
added)) *with id.* § 5302(2)(ii)(C) ("at the time of disclosure or use, *knew or had reason to know*
*that his knowledge* of the trade secret was . . . derived from or through a person who owed a duty
to the person seeking relief to maintain its secrecy or limit its use" (emphasis added)). In the
absence of such specific, explicit language creating a specific intent requirement in the relevant
subsection, the Court will not imply one.

*   *   *

APT may well face evidentiary difficulties proving that its efforts to protect its coated SBP method were reasonable or that VWR improperly acquired that information. But APT has pleaded sufficient facts to survive a motion to dismiss.[11]

### B.     Breach of Contract (Count II)

Count II is a claim for breach of contract. APT and VWR's relationship was founded on two contracts, their Distribution Contract and their Operations Document. *See* SAC Exs. B & C. The parties agree that Pennsylvania law requires a plaintiff alleging breach of contract to plead facts establishing the existence of a contract, a breach of that contract, and damages resulting from the breach. *See, e.g.*, *J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc.*, 792 A.2d 1269, 1272 (Pa. Super. Ct. 2002); *see also* APT Resp. at 27; VWR Mot. Dismiss at 30. Further, the parties agree that they were bound by their two contracts. Their dispute focuses on the narrower question of whether VWR breached any duty of confidentiality pursuant to either or both of them. APT claims that two issues are relevant to this inquiry. First, APT contends that by misappropriating APT's trade secrets from XXPC and using them to produce its own product lines, VWR breached a specific contractual duty not to use APT's confidential information. *See* SAC ¶¶ 91-96. Second, APT claims that "VWR breached its duty of good faith and fair dealing, inherent in every contract, by inducing XXPC and Mr. Fu to make products for VWR using [APT's] trade secrets during the terms of the Distribution Contract and Operations Document." SAC ¶ 97.

---

[11] VWR's remaining contentions arguing that APT has failed to state a claim—such as the argument that APT waited two years before bringing this claim, or that it has not alleged that its SBP method is a trade secret today—are meritless.

Before reaching the substance of these questions, the Court notes that, despite raising what seem to be two breach of contract claims in its SAC, viz., alleged breach of confidentiality and alleged breach of the duty of good faith and fair dealing, APT has pressed only the former in response to VWR's Motion to Dismiss. APT raised a breach of contract claim for the first time in its SAC, and VWR devotes much energy to arguing, first, that VWR did not breach any duty of confidentiality and second, therefore, that APT cannot state a separate claim for breach of duty of good faith and fair dealing because Pennsylvania courts do not "recognize[] an independent cause of action for breach of a duty of good faith and fair dealing." VWR Mot. Dismiss at 33. But it is not necessary to reach this question of law, namely, of whether an independent cause of action exists for breach of a contractual duty of good faith and fair dealing, because APT, in its Response, explains that it "has not attempted to set forth a separate and independent claim for breach of the duty of good faith and fair dealing." APT Resp. at 30. Thus, the Court need decide only whether VWR could have breached a duty of confidentiality by allegedly acquiring APT's trade secrets from XXPC and using them to manufacture its own line of products.

The essence of APT's breach of confidentiality claim is that the parties' Distribution Contract binds VWR not to use, publish, or disclose any of APT's confidential information. But, as VWR argues, this reading is not supported by the Distribution Contract's plain language. The relevant provision of the Distribution Contract provides, in full and with emphasis on the determinative wording:

   **9.**   **Marketing Information**

   a.   Confidentiality

   Supplier and Distributor acknowledge and agree that *pursuant to this Agreement* valuable information of a confidential nature, which includes but is not limited to marketing, sales and new product development information may be disclosed to each other; that *such information* will be retained by Supplier and Distributor in confidence; that *the transmittal of*

*such information hereunder* is upon the express condition that the information is to be used solely for the purpose of effectuating this Agreement; and that Supplier and Distributor shall not, either during the term of this Agreement or after its termination, use, publish or disclose or cause anyone else to use, publish or disclose *any information supplied hereunder*. Not withstanding [sic] anything in the foregoing, the above restrictions on disclosure and use shall not apply to any information which Supplier or Distributor can show by written evidence was known to it at the time of receipt thereof from the other party or which may subsequently be obtained from sources other than the other party who are not bound by a confidentiality agreement with such other party.

    b.    <u>Remedy for breach</u>

Each party hereto recognizes and acknowledges that the other party would not have an adequate remedy at law for the breach of the confidentiality covenants contained herein and agrees that in the event of such breach, the other party may, in addition to the other remedies which may be available to it, file a suit in equity for injunctive relief.

Distribution Contract ¶ 9, SAC Ex. B (emphasis added).

VWR offers a handful of arguments as to why paragraph 9 of the Distribution Contract does not apply to the confidential information it allegedly acquired from XXPC despite XXPC's oral confidentiality agreement with APT. It argues that the title of the paragraph, "Marketing Information," "strictly defin[es] the type of information covered," and Alpha's trade secret is not marketing information. VWR Mot. Dismiss at 32. Further, it argues, even if the clause does cover such trade secrets, paragraph 9 "explicitly protects only 'information supplied hereunder'—that is information supplied under the parties' agreement." *Id.* And, further, VWR argues that APT "has not pointed to any information supplied under the contracts that was later used improperly by VWR." *Id.* at 32-33. APT's brief response is simply that "[u]nder the parties' Distribution [Contract], VWR was prohibited from *using*, publishing or disclosing confidential information belonging to [APT] that it received either from [APT] or from a third party with confidentiality obligations owed to [APT]." APT Resp. at 29. APT also contends that VWR's argument regarding the "Marketing Information" title of the paragraph fails because the text of

24

paragraph 9 states that the information in question "*includes but is not limited to* marketing, sales and new product development information." *Id.* at 30 n.6 (emphasis in Response) (quoting Distribution Contract ¶ 9(a)). Thus, APT contends, "[b]y acquiring [APT's] confidential trade secrets from XXPC and using them to create its competing product line, VWR breached the Distribution [Contract]." *Id.* at 30.

The flaw in APT's argument is that it is not grounded in the explicit text of the contract, which provides that information "disclosed" by the parties "to each other" "*pursuant to this Agreement*" is protected. Distribution Contract ¶ 9(a) (emphasis added). The restrictions on use, publication, or disclosure are restrictions on "the transmittal of such information *hereunder*"— that is, disclosed "*pursuant to this Agreement*." *Id.* (emphasis added). The final sentence of paragraph 9(a), as VWR argues, *see* VWR Mot. Dismiss at 33 n.9, does not categorically prohibit either party from obtaining confidential information from a third party who is "bound by a confidentiality agreement" with the other party. Rather, that sentence exempts from the contract's protection of information transmitted "hereunder"—i.e., "pursuant to this Agreement"—both information that the other party (a) already knows ("information which Supplier or Distributor can show by written evidence was known to it at the time of receipt thereof") and (b) "information . . . which may subsequently be obtained from sources other than the other party who are not bound by a confidentiality agreement with such other party."

There is no reasonable argument, and APT does not attempt to advance one (other than simply by conclusory assertion) that this second exemption applies beyond information that was transmitted "pursuant to this Agreement." While it may frustrate APT that its confidentiality provision does not cover the alleged facts of this case, in which VWR allegedly clandestinely approached XXPC to solicit APT's trade secrets, logically, the plain language of the contract can

only exempt information which would otherwise fall under the foregoing provisions, and the foregoing provisions apply only to information transmitted "pursuant to this Agreement." "The law does not create such burdens [as having been read into the language of the contract] when the language of the contract is explicit," *Siegel Transfer, Inc. v. Carrier Exp., Inc.*, 856 F. Supp. 990, 1007 (E.D. Pa. 1994), *aff'd*, 54 F.3d 1125 (3d Cir. 1995), and "[t]o hold otherwise would be to make an entirely new contract for the parties quite outside the explicit language" of their agreement. *Hollobaugh v. People's Mut. Acc. Ins. Ass'n*, 22 A. 29, 30-31 (Pa. 1891). And accepting that VWR had any duty of good faith and fair dealing, even if the parties' agreement was exclusive, as APT argues, would not change the interpretation of these operative words of the contract.

This reading of the confidentiality provision does not undermine its probable purpose. The intent of the parties, one might infer, was to protect each other's disclosures under the agreement, for the purpose of facilitating their working together, without binding each other not to use information in the future if, although it may have been disclosed in confidence by the other party, or a promisee in confidentiality of the other party, that information "may subsequently be obtained from sources other than the other party," so long as those parties, too, "are not bound by a confidentiality agreement with such other party." In other words, the information may be transmitted in secret one day, but if the transmitting party were no longer to feel the need to keep it secret, such that the other party might therefore obtain it "from sources other than the other party," the information would no longer be subject to the confidentiality provision's strictures. That situation does not apply here, but it logically explains a reasonable construction of the Distribution Contract and, therefore, in turn, why paragraph 9 serves a logical

purpose without applying to information that is *not* "supplied hereunder." Count II falls in response to the challenge.

### C.       Unjust Enrichment (Count III)

To prevail on a claim for unjust enrichment under Pennsylvania law, a plaintiff must prove "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999). The question is not the intent of the parties, but rather "whether the defendant has been unjustly enriched." *Id.*

VWR raises three arguments as to why APT's unjust enrichment claim must fail. First, it argues, "Pennsylvania law is clear that the existence of a written or express contract between the parties bars an unjust enrichment claim." VWR Mot. Dismiss at 19. Second, it contends, APT has failed to allege VWR's use of APT's trade secret. And finally, APT has "failed to allege that VWR's acceptance and retention of the benefits, under the circumstances, would make it inequitable for [VWR] to retain the benefit without paying for the value of the benefit." *Id.* at 20.

The first two of these arguments are easily rejected. First, the failure of APT's breach of contract claim removes any impediment, if there were one, presented by a contract between APT and VWR. But more fundamentally, Federal Rule of Civil Procedure 8 explicitly states that "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3); *see Indep. Enters. Inc. v. Pitt. Water & Sewer Auth.*, 103 F.3d 1165, 1175 (3d Cir. 1997) ("This Rule permits inconsistency in both legal and factual allegations and has been interpreted to mean that a court may not construe a plaintiff's first claim as an admission against another alternative or inconsistent claim." (citation, alteration, and internal quotation marks

omitted)). The Court reiterates that this litigation is at the motion to dismiss stage. That APT may

not ultimately *recover on both* a breach of contract claim and an unjust enrichment claim does

not impugn the well settled principle that under both federal law and Pennsylvania law a plaintiff

*may plead* both. *See also, e.g.*, *Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 969-70 (Pa. Super.

Ct. 2009).

Second, for the reasons stated above in subsection III.A.3, APT has adequately alleged

VWR's use of APT's trade secrets.

Finally, VWR argues that "the mere fact that one party benefits from the act of another is

not of itself sufficient to justify restitution"; rather, "[t]here must also be an unconscionable

injustice in permitting the benefit to be retained without compensation." VWR Mot. Dismiss at

20-21 (quoting *Global Ground Support, LLC v. Glazer Enters., Inc.*, 581 F. Supp. 2d 669, 676

(E.D. Pa. 2008)). VWR's reasoning, however, does not persuade the Court that APT's

allegations fail to establish that allowing VWR to retain the benefit here would be

unconscionable, because VWR's main argument—its reliance on *Global Ground Support, LLC*

*v. Glazer Enterprises, Inc.*, 581 F. Supp. 2d 669—is misplaced.

In *Global Ground Support*, the court looked to section 110 of the *Restatement (First) of*

*Restitution* for the rule that applies in the case in which a plaintiff-promisee seeks to recover,

based on a contract, against a defendant who was a third party to that contract and upon whom,

pursuant to that contract, the plaintiff-promisee conferred a benefit in exchange for a promise by

the promisor, who is not the defendant in the later lawsuit. *See Global Ground Support*, 581 F.

Supp. 2d at 676; *Restatement (First) of Restitution* § 110 ("A person who has conferred a benefit

upon another as the performance of a contract with a third person is not entitled to restitution

from the other merely because of the failure of performance by the third person."); *Restatement*

*(First) of Restitution* § 110 cmt. b ("The fact that performance has been given to the third person and not to the promisor does not prevent the promisee from obtaining from the promisor by way of restitution the value of what he gave."). The Court held that enrichment was not unjust "in the absence of misleading by the third party," because "the mere failure of performance by one contracting party does not give rise to a right of restitution against the third party." *Global Ground Support*, 581 F. Supp. 2d at 676.

The rule and reasoning from *Global Ground Support* are inapplicable here. *Global Ground Support*, like the section of the *Restatement (First) of Restitution* upon which it relied, deals with the situation where two parties' contract provides, among other things, that a third party shall receive a certain benefit and, after the third party receives the benefit, the promisor fails to deliver and the promisee, who conferred the benefit on the third party, wants it back from the third party, whom the promisee sues and names as the defendant. VWR constructs its argument here on the alleged contractual relationship between APT and XXPC. For the relationships to be analogous to those in *Global Ground Support* or the *Restatement*, APT's allegations would have to be, in essence, that: APT and XXPC's contract provided that VWR would receive APT's coated SBP method and formula in exchange for some performance on the part of XXPC, which, failing to perform, did not pay APT for the method and formula, at which point APT now seeks to recover the value of the method and formula back from VWR, the third party to the contract. But here, to the contrary, APT's actual contention is that XXPC should never have given VWR the information—the APT–XXPC contract did not provide for such transmittal and APT certainly did not bargain for it. Thus, APT's unjust enrichment claim survives, because VWR has offered no other reasons for why it should fail at this stage.[12]

---

[12] To the extent that VWR's briefing suggests that the fact that "it was XXPC, not [APT] that ultimately passed this information on to VWR," Mot. Dismiss at 21; *see also id.* at 20 n.7, makes

\*   \*   \*

Notwithstanding the survival of APT's unjust enrichment claim at this stage, the development of the factual record in this case will reveal whether the claim is ultimately viable. If and when APT establishes that the coated SBP information constituted a trade secret, the unjust enrichment claim will necessarily fail, because PUTSA preempts common law claims, including unjust enrichment, that are "based on the same conduct that is said to constitute a misappropriation of trade secrets." *Youtie v. Macy's Retail Holding, Inc. (Youtie II)*, 653 F. Supp. 2d 612, 620 (E.D. Pa. 2009); *see* 12 Pa. Cons. Stat. Ann. § 5308 ("[T]his chapter displaces conflicting tort, *restitutionary* and other law of this Commonwealth providing civil remedies for misappropriation of a trade secret." (emphasis added)); *Youtie v. Macy's Retail Holding, Inc. (Youtie I)*, 626 F. Supp. 2d 511, 521 (E.D. Pa. 2009); *see also* VWR Prior Mot. Dismiss at 24 n.9 (Docket No. 20) (raising this argument). And APT, attempting to avoid the bar on double recovery for breach of contract and unjust enrichment, claims unequivocally that its "claim of unjust enrichment does not arise from conduct governed by its contracts with VWR—the claim arises from VWR's tortious misappropriation of [APT's] trade secrets." APT Resp. at 18. Indeed, APT asserts that its "claim for unjust enrichment is and has always been premised on VWR's misappropriation of [its] trade secrets and confidential information." *Id.* at 18 n.4. Hence, if and when APT makes this showing, its unjust enrichment claim will perish.

---

the conferral of the benefit too attenuated or somehow not from the plaintiff to the defendant, this argument fails. Pennsylvania's unjust enrichment law does not require the conferral to be direct: "The claim of unjust enrichment simply requires that plaintiff 'confer' benefits on a defendant; it does not require that plaintiff 'directly confer' those benefits." *Global Ground Support*, 581 F. Supp. 2d at 676 (quoting *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 420 (E.D. Pa. 2006)); *see also, e.g.*, *Pennsylvania ex rel. Pappert v. TAP Pharm. Prods., Inc.*, 885 A.2d 1127, 1137-38 (Pa. Commw. Ct. 2005).

This claim does not yet succumb because, notwithstanding APT's assuredness that the information in question constitutes trade secrets, "the cases holding that [PUTSA] does not preempt common law tort claims when it has yet to be determined whether the information at issue constitutes a trade secret take the better approach." *Cenveo Corp. v. Slater*, No. 06-2632, 2007 WL 527720, at *3 (E.D. Pa. Feb. 12, 2007) (discussing cases). As the *Cenveo Corp. v. Slater* Court explained,

> Preempting plaintiff's conversion claim at the motion to dismiss stage risks leaving the claimant . . . without a remedy for information he proves has been stolen. For example, . . . if the Court were to dismiss plaintiff's conversion claim and later make the finding that, although plaintiff had proved that defendants took its pricing structure and business proposals, such information was not a protected trade secret under [PUTSA], the Court would be in the difficult position of telling the plaintiff that it had no remedy.

*Id.*

Similar reasoning applies here with regard to APT's claim for unjust enrichment. However unlikely the case may be, if APT fails to prove that its coated SBP method constituted a trade secret but nonetheless proves that it was a benefit conferred by XXPC upon VWR, which unjustly retained it, APT should be able to pursue an unjust enrichment claim. Such an outcome can make sense, given that while PUTSA technically preempts common law unjust enrichment, it in fact provides for that very remedy. *See* 12 Pa. Cons. Stat. Ann. § 5304 ("Damages can include both the actual loss caused by misappropriation and *the unjust enrichment caused by misappropriation* that is not taken into account in computing actual loss." (emphasis added)).

### D.   Tortious Interference with an Existing Contractual Relationship (Count IV)

VWR advances four reasons why APT's tortious interference claim (Count IV) should fail. It argues, first, that the claim is barred by the statute of limitations; second, that it is barred by the economic loss and gist of the action doctrines; third, that APT has failed to allege VWR's

intent to interfere with APT's contract with XXPC; and finally, that APT has failed to allege facts satisfactorily that demonstrate that VWR's conduct is not privileged. *See* VWR Mot. Dismiss at 22-30. Because the Court finds merit in VWR's fourth contention, it will dismiss Count IV on that basis without addressing VWR's remaining arguments.

The Third Circuit Court of Appeals, interpreting Pennsylvania law, has explained that a plaintiff claiming tortious interference with an existing contractual relationship must prove:

> (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; [and] (4) legal damage to the plaintiff as a result of the defendant's conduct . . . .

*Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009).

Here, APT's claim turns on the third requirement—"the absence of privilege or justification on the part of the defendant." While the Pennsylvania Supreme Court has not yet provided a definitive construction of this requirement, Pennsylvania courts look to section 768 of the *Restatement (Second) of Torts* and its definition of "wrongful means" for guidance as to whether the defendant has acted with privilege or justification, *Acumed*, 561 F.3d at 215 (citing *Gilbert v. Otterson*, 550 A.2d 550, 554 (Pa. Super. Ct. 1988)), as both parties recognize, *see* VWR Mot. Dismiss at 28; APT Resp. at 26-27. Further, the Third Circuit Court of Appeals has held that under section 768, "if the parties are competitors, [the factfinder] must find that [the defendant] engaged in *independently actionable conduct* for it to find in favor of [the plaintiff] on the tortious interference claim." *Acumed*, 561 F.3d at 219 (emphasis added); *accord Nat'l Data Payment Sys., Inc. v. Meridian Bank*, 212 F.3d 849, 858 (3d Cir. 2000) ("[W]e believe that Pennsylvania would follow the 'independently actionable' approach for § 768 claims.").

"Wrongful means" thus requires more than unethical or morally opprobrious conduct alone. It

demands that the factfinder conclude that the defendant committed "an independently actionable tort." *Acumed*, 561 F.3d at 219 n.15. In sum, "[i]n the absence of some evidence that [the defendant] engaged in independently actionable conduct, it is shielded from liability by the competition privilege, and thus . . . the tortious interference claim against it cannot stand." *Acumed*, 561 F.3d at 220.

APT itself advances this "independently actionable" feature of section 768 of the *Restatement (Second) of Torts* and contends that "independently actionable" tortious conduct encompasses "the misappropriation of confidential, proprietary or trade secret information." APT Resp. at 26 (citing, inter alia, *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 212 (Pa. Super. 2003); *Gilbert*, 550 A.2d 550). For its part, VWR argues that "the alleged facts, if true, show VWR's actions fall well within the business competitor's privilege" because APT has not alleged facts "to plead the absence of VWR's privilege or justification to allegedly contract and work with XXPC." VWR Mot. Dismiss at 29.

Of course, the reality is more complicated, but it nonetheless confirms that the wrongful means/independently actionable standard is applicable here. APT's allegation regarding privilege or justification is conclusory. APT states, "VWR lacked a privilege or justification for such interference, particularly in light of its existing contractual obligations to [APT]." SAC ¶ 115. Under the wrongful means/independently actionable standard articulated above, and in light of APT's conclusory allegation, the only way APT can sufficiently plead tortious interference with APT's contractual relationship with XXPC is if the factual allegations elsewhere in the SAC suggest that VWR's conduct is independently actionable.

APT alleges that "[a]s a result of VWR's interference with [APT's] existing contractual relationship with XXPC, APT's trade secrets have been jeopardized, resulting in lost sales of

over 15 million dollars." SAC ¶ 116. And in its briefing, it makes only two contentions for the sufficiency of its tortious interference claim: "As set forth at length in Sections B [regarding misappropriation of trade secrets] and C [regarding unjust enrichment] above, VWR's actions with respect to [APT's] relationship with XXPC and the production of Coated SBP . . . products *is* independently actionable." APT Resp. at 27.

APT's problem, however, is that neither of these two causes of action can help it here. If, on the one hand, APT's tortious interference claim is to be based on misappropriation of trade secrets—APT's core contention—that claim must fail for one of two reasons. Either the coated SBP method is a trade secret—in which case the tortious interference claim is preempted by PUTSA, as discussed above, *see supra* section III.C; *Youtie II*, 653 F. Supp. 2d at 620; *Youtie I*, 626 F. Supp. 2d at 521—or it is "something less," in which case it is not preempted, *Youtie I*, 626 F. Supp. 2d at 521, but also not "independently actionable."

And on the other hand, APT cannot base its tortious interference claim on its unjust enrichment claim as an independently actionable basis. For one, unjust enrichment does not sound in tort; rather, it is a restitutionary cause of action based on an implied or constructive contract. *See Sevast v. Kakouras*, 915 A.2d 1147, 1153 n.7 (2007) ("An action based on unjust enrichment is an action which sounds in quasi-contract or contract implied in law."); *see also, e.g.*, *Integrated Waste Solutions, Inc. v. Goverdhanam*, No. 10-2155, 2010 WL 4910176, at *15 (E.D. Pa. Nov. 30, 2010) (citation omitted) ("The equitable doctrine of unjust enrichment sounds in quasi-contract—a contract implied in law. The gist of the action doctrine does not apply to causes of actions based upon implied or constructive contracts. Accordingly, the court will not bar Plaintiff's unjust enrichment claim against Defendants Prime and Dumpster Direct based on this doctrine."). The gravamen of the "independently actionable" requirement is that the conduct

34

complained of, upon which the plaintiff seeks to base its tortious interference claim, is independently actionable *in tort. See Acumed*, 561 F.3d at 219 & n.15. After all, the cause of action is *tortious* interference with contract.

Second, even were this not the case—i.e., even if unjust enrichment sounded in tort or, alternatively, if the independently actionable conduct needed not be tortious—unjust enrichment is the wrong candidate because its concern is not the wrongful nature of the defendant's mental state, which is clearly the focus of the wrongful means/independently actionable inquiry. Instead, "[i]n determining if the doctrine applies, [a court's] focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched," *Mitchell*, 729 A.2d at 1204, that is, upon the effect of the parties' conduct, rather than the reason for it. In fact, APT makes exactly that contention in support of its unjust enrichment claim. *See* APT Resp. at 17 ("In determining whether the doctrine [of unjust enrichment] applies, the focus is not on the intention of the parties, but on the result."). A doctrine not focused on the defendant's intent can hardly be the predicate for the "wrongful means" claim of a tortious interference of contract claim, which requires the plaintiff to prove "(2) *purposeful action* by the defendant, *specifically intended* to harm an existing relationship . . . ; [and] (3) the absence of privilege or justification on the part of the defendant." *Acumed*, 561 F.3d at 212 (emphasis added).

Because APT has only pleaded, and argued, trade secret and unjust enrichment bases for its tortious interference claim, and neither of these bases will suffice, Count IV must be dismissed.

### E.    Lanham Act False Advertising and False Designation of Origin (Count V)

APT brings claims under the Lanham Act, 15 U.S.C. § 1125(a), for (1) false advertising and (2) false designation of origin. VWR disputes that APT has properly pleaded either.

Section 43(a) of the Lanham Act, codified at 11 U.S.C. § 1125(a), provides, in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).

### 1. False Advertising

To prevail on a false advertising claim, a plaintiff must prove that (1) the defendant has made false or misleading statements about its own product or the plaintiff's; (2) "there is actual deception or at least a tendency to deceive a substantial portion of the intended audience"; (3) "the deception is material in that it is likely to influence purchasing decisions"; (4) "the advertised goods traveled in interstate commerce"; and (5) "there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011) (citations omitted).

The deception required by the second prong does not require that the advertisement be "literally false." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002). Rather, liability for false advertising "arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous,

but has the tendency to deceive consumers." *Id.* If the plaintiff can show the literal falsity of the message, he earns a presumption of actual deception; if, on the other hand, "the message conveyed by an advertisement is literally true or ambiguous, however, the plaintiff must prove actual deception or a tendency to deceive." *Pernod Ricard*, 653 F.3d at 248. Because the concern is "the message that is conveyed to consumers," to fall under the statute's coverage of deceptive statements, a message that is not literally false must be proved to have misled the public by reference to actual confusion on the part of consumers: "Public reaction is the measure of a commercial's impact." *Johnson & Johnson–Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129-30 (3d Cir. 1994); *accord Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 171 (3d Cir. 2001) ("If a claim is literally true, a plaintiff cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react." (citation and internal quotation marks omitted)). "If the advertisement is literally true, the plaintiff must persuade the court that the persons to whom the advertisement is addressed would find that the message received left a false impression about the product." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir. 1990) (citation and internal quotation marks omitted).

Here, APT claims that VWR made both literally false as well as true but misleading statements in its advertising. APT Resp. at 34. In essence, APT alleges two types of false or misleading statements. First, it alleges that APT's advertising "caused consumers to believe that VWR's products were the CRITICAL COVER® products under a different brand name" when in fact this message was "false because the products' manufacturer had changed (*i.e.*, it was no longer [APT], the manufacturer of CRITICAL COVER® products), and because the process had changed (*i.e.*, it was no longer subject to the quality control and warranties of [APT])." SAC

¶ 122. Second, APT alleges that "VWR's promotion, advertisement, distribution, sale, and/or offering for sale of its products" misrepresented (even if by implication), "that the CRITICAL COVER® products had been discontinued." SAC ¶ 123. In response, VWR argues that it has not made any false or misleading advertising statements because "(1) [APT] did not manufacture any of the products at issue; (2) consumers did not believe that [APT] manufactured the CRITICAL COVER® products; and (3) consumers are not mislead [sic] into believing that [APT] manufactured, or have anything to do with, the VWR Protection line." VWR Mot. Dismiss at 36.

     VWR argues first that APT's claim must fail because APT cannot claim that APT itself was the manufacturer of the CRITICAL COVER® products—rather, it avers, XXPC was. *See* VWR Mot. Dismiss at 36-38. However, APT's partnership with XXPC to manufacture the CRITICAL COVER® products does not mean that APT, too, was not a manufacturer, and the Court declines to construe XXPC's role as manufacturer as mutually exclusive with APT's. Second, VWR's contention misses the point because APT's allegation, which must be construed favorably to APT at the motion to dismiss stage, states that VWR's advertising "caused consumers to believe that *VWR's products were the CRITICAL COVER® products under a different brand name*." SAC ¶ 122 (emphasis added). CRITICAL COVER® is one of APT's trademarks, so if VWR did not have a license to use it—and APT has pleaded that "VWR's license to do so expired," SAC ¶ 121—then any statements, even if true, that led customers to believe that VWR's products were CRITICAL COVER® products would be actionable as false advertising. Unless VWR were to concede it was infringing APT's CRITICAL COVER® trademark—which, obviously, it does not do—the CRITICAL COVER® products are necessarily different from VWR's own product line.

Moreover, more than simply the identity of the manufacturer must be part of this analysis—and APT has alleged that the manufacturing "process had changed" because "it was no longer subject to the quality controls and warranties of [APT]" because APT was no longer involved in the process. SAC ¶ 122. Indeed, VWR seems to suggest, in opposing APT's misappropriation of trade secrets claim, that VWR's "Protection Line" did not use "the particular combination and quantity of polymers that help make up [APT's] alleged trade secret." VWR Mot. Dismiss at 18 (citation and internal quotation marks omitted). The point is not that APT's customers had to understand that APT was the CRITICAL COVER® manufacturer, as VWR contends, *see* VWR Mot. Dismiss at 38, but that, as APT alleged, VWR's misleading advertising "caused consumers to believe that VWR's products were the CRITICAL COVER® products under a different brand name." And in addition to simply asserting such actual confusion, APT's SAC further alleges that "VWR's representations convinced a substantial amount of the relevant customers that VWR's products were [APT's] CRITICAL COVER® products with a new name," SAC ¶ 75, as allegedly confirmed by APT sales representatives' conversations with purchasers, *see* SAC ¶ 76. Furthermore, the SAC contains a detailed table enumerating alleged false and/or misleading statements with references to one of VWR's marketing materials, attached as Exhibit F. *See* SAC ¶ 70, Ex. F.

That the allegations are sufficient to make out a claim at the motion to dismiss stage, however, does not mean that APT will not face other hurdles. In fact, a large and potentially dispositive issue of fact may be whether VWR's products were identical, or even superior, to APT's CRITICAL COVER® products. If they were, the false advertising claim likely cannot be sustained because the message, in addition to being misleading, if at all, in only a formal sense (i.e., if the VWR products were not technically the CRITICAL COVER® products because APT

owned that trademark, but they were in fact identical), would also likely be immaterial—that is, the deception would be unlikely "to influence purchasing decisions." *Pernod Ricard*, 653 F.3d at 248; *cf.* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:74, at 27-202 to 27-203 (4th ed. Mar. 2013) ("[T]here is no false advertising liability if the product being sold in fact by defendant is of a higher quality than the product pictured such that no one would be deceived to their detriment. . . ."). In that case, as VWR contends in its second argument, APT will not likely be able to show any "nexus between VWR's advertising and any harm allegedly suffered by [APT]," because APT has not alleged that customers would pay its higher prices for identical products. But for now, these issues, like VWR's arguments that APT's "decline in sales since 2010 is due solely to its inability to find a distribution partner for CRITICAL COVER® products that was as profitable as VWR," VWR Mot. Dismiss at 40, are questions of fact, and thus not appropriate for resolution now. APT's false advertising claim survives the Rule 12(b)(6) challenge.

### 2. False Designation of Origin

A false designation of origin claim is similar to a false advertising claim; indeed, APT argues that "[h]ere, the [false advertising and false designation of origin] analyses . . . collapse into one another because the heart of VWR's deceptive practices—promoting its products as a continuation of the CRITICAL COVER line under a new name—encompasses both false advertising and false designation of origin," APT Resp. at 31. Nonetheless, a false designation of origin claim has different elements. A plaintiff claiming false designation origin must allege:

> (1) that the defendant uses a false designation of origin; (2) that such use of a false designation of origin occurs in interstate commerce in connection with goods or services; (3) that such false designation is likely to cause confusion, mistake or deception as to the origin, sponsorship or approval of the plaintiff's goods and services by another person; and (4) that the plaintiff has been or is likely to be damaged.

*Parker v. Google, Inc.*, 242 F. App'x 833, 838 (3d Cir. 2007) (citing *AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1428 (3d Cir. 1994)).

False designation of origin claims are also known as "passing off" or "palming off" claims because the defendant has allegedly used the plaintiff's trademark to brand its own products as the plaintiff's—i.e., as ones that may properly bear the mark. As described by a leading case, "'[p]alming off'" or "'passing off'" is the selling of a good or service of one's own creation under the name or mark of another," and it

> may be either "express" or "implied." Express passing off occurs when an enterprise labels goods or services with a mark identical to that of another enterprise, or otherwise expressly misrepresents that the goods originated with another enterprise. Implied passing off occurs when an enterprise uses a competitor's advertising material, or a sample or photograph of the competitor's product, to impliedly represent that the product it is selling was produced by the competitor.

*Smith v. Montoro*, 648 F.2d 602, 604 (9th Cir. 1981). Like other courts, the Third Circuit Court of Appeals recognizes that such behavior violates section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)—even, for example, where the objectionable conduct is the defendant's passing off that lures potential customers away from the plaintiff but where the customers recognize the passing off before actually transacting business with the defendant. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 294-95 (3d Cir. 2001). This particular type of passing off, which creates what is known as "initial interest confusion," is prohibited by the Lanham Act because without such protection, "an infringer could use an established mark to create confusion as to a product's source thereby receiving a 'free ride on the goodwill' of the established mark." *Id.*

As these requirements indicate, the essence of a false designation of origin claim differs from that of a false advertising claim because while the latter "involve[s] allegations that the public was misled into purchasing a particular entity's product" at the expense of the plaintiff

and its product, the former involves claims of "'false representations as to the source or origin of goods or services by a [trade]mark confusingly similar to one already in use.'" *Winback*, 42 F.3d at 1443-44 (citation omitted). The test for false designation of origin is not "actual confusion," but rather "likelihood of confusion." *Id.* at 1442-44. And the crucial point is that courts do not interpret section 43(a) of the Lanham Act to have rigid boundaries. Rather, as a leading treatise explains,

> The development of more complex business relationships has within recent years been accompanied by a broadening of the scope of unfair competition beyond the bounds of the standard 'palming off' situations. The *flexible limits* of the expanded doctrine have in large measure been pragmatically defined by the exigencies of the particular fact patterns involved.

5 *McCarthy*, *supra*, § 25:1, at 25-7 (4th ed. Sept. 2012) (emphasis added) (citation omitted). The Third Circuit Court of Appeals appears to have embraced this view. As it explained in one section 43(a) case,

> AT & T's allegations are an amalgam of a classic section 43(a) claim alleging misuse of a mark, a claim of false advertising pursuant to 15 U.S.C. § 1125(a)(2), and a claim of passing off. . . . [But] none of the tests outlined in this footnote adequately captures the essence of AT & T's claims. *The test we employ is geared to the factual situation of this case.*

*Winback*, 42 F.3d at 1428 n.9. In other words, the *Winback* Court indicated that the test is indeed flexible by adapting it to the circumstances at hand.

The usefulness of employing such flexible adjustment suggests itself here. Although VWR argues that "(1) there are no [APT] designations of origin; and (2) even if there were (reading the materials as broadly as possible), VWR has not used such designations falsely, but instead, has used them fairly and referentially to provide truthful and accurate information to consumers," VWR Mot. Dismiss at 42, there is in fact is a potential false designation of origin based on the CRITICAL COVER® trademark itself. Of course, as discussed above with regard to false advertising, if VWR's newer product line is the same as, or superior to, APT's CRITICAL

42

COVER® line, this false designation/passing off claim may not stand. But, accepting the *Winback* Court's guidance to employ a flexible test "geared to the factual situation of this case," *Winback*, 42 F.3d at 1428 n.9, the Court holds that APT's factual allegations, if proven true, would make out a claim for false designation of origin/implied passing off. VWR's marketing materials—attached to the SAC as Exhibits D and F—would, in that case, be likely to confuse consumers as to whether VWR's new products were simply CRITICAL COVER® products by another name, and thus products passed off as, but not in fact, CRITICAL COVER® products. APT alleges, "VWR's representations convinced a substantial amount of the relevant customers that VWR's products were [APT's] CRITICAL COVER® products with a new name." SAC ¶ 75. Section 43(a) of the Lanham Act is properly interpreted to reach such conduct, as APT alleges, because otherwise a defendant could escape liability for passing off simply by using another's mark—a false designation of origin—to establish the equivalency of the other's mark and the defendant's new mark, and then shift to using only its new mark. The defendant would be doing indirectly what section 43(a) clearly prohibits it from doing directly. If "that which we call a rose / By any other name would smell as sweet," Wm. Shakespeare, *Romeo and Juliet* act II, sc. 2, then that which is specially coated spun bond polypropylene would by any other mark laminate as faithfully.

Specifically, this issue cannot be resolved at the motion to dismiss stage because APT's SAC pleads statements from VWR's marketing materials, *see* SAC Ex. F, that can be read as misleading because they were likely to confuse. Unlike a false advertising claim, a false designation of origin/passing off claim requires not proof of actual confusion, but rather proof of *likely* confusion. *See, e.g.*, *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 473 &

n.8 (3d Cir. 1994). To determine the likelihood of confusion, the factfinder must consider,

among other factors,

>    (1) [The] degree of similarity between the owner's mark and the alleged
>    infringing mark;

>    (2) the strength of the owner's mark;

>    (3) the price of the goods and other factors indicative of the care and attention
>    expected of consumers when making a purchase;

>    (4) the length of time the defendant has used the mark without evidence of
>    actual confusion;

>    (5) the intent of the defendant in adopting the mark;

>    (6) the evidence of actual confusion;

>    (7) whether the goods, though not competing, are marketed through the same
>    channels of trade and advertised through the same media;

>    (8) the extent to which the targets of the parties' sales efforts are the same;

>    (9) the relationship of the goods in the minds of consumers because of the
>    similarity of functions; and

>    (10) other facts suggesting that the consuming public might expect the prior
>    owner to manufacture a product in the defendant's market or that he is likely to
>    expand into that market.

>    None of these factors is determinative in the likelihood of confusion analysis
>    and each factor must be weighed and balanced one against the other.

*Checkpoint Sys., Inc.*, 269 F.3d at 280 (alteration in original) (citing *Fisons*, 30 F.3d at 473). As

the Third Circuit Court of Appeals has further explained, in this "qualitative inquiry," "[n]ot all

factors will be relevant in all cases," and their respective weights may differ in different factual

settings. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215 (3d Cir.

2000). "A district court should utilize the factors that seem appropriate to a given situation." *Id.*

Here and now, however, at the motion to dismiss stage, the time has not yet come to

perform that inquiry. APT has pleaded likelihood of confusion, and although its allegations are

far from a model of specificity, *see* SAC ¶ 123, the SAC contains a comparison of statements

that could create such confusion:

- "It is also worth noting that we have not changed the manufacturer, manufacturing location, or the manufacturing process for 95% of the products in our new line. For the majority of the portfolio, only the brand name and part numbers will change, and we will continue to make available the previous line of VWR Critical Cover products for a minimum of 30 days during this transition." SAC Ex. F, at 1 para. 3; SAC ¶ 70;
- "VWR Advanced and Maximum Protection apparel (the products formerly known under the VWR Critical Cover ComforTech™ and Microbreathe™ brands) will experience a change in raw materials." SAC Ex. F, at 1 para. 4; SAC ¶ 70;
- "As you are aware, VWR is transitioning our VWR Critical Cover® apparel line to our new line of VWR Protection apparel. . . . As a result of these audits, we are writing this letter to certify that for 95% of the products involved in this transition, there will be no change in the manufacturer, manufacturing location, or manufacturing process." SAC Ex. F, at 5 paras. 1-3; SAC ¶ 70; and
- A table, preceded by the text, "In addition to the above certification, below is a list of VWR Protection apparel products that will not experience a change in raw materials," in which "Old Brand Name" trademarks were aligned with "New Brand Name" product lines. SAC Ex. F, at 5 para. 5 & tbl.; SAC ¶ 70.

APT alleges that these statements are false and/or misleading because, for instance,

"VWR's statements . . . were 'not formerly known under' [APT's] trademark," and/or they

"lead[] consumers to believe that the source of the VWR products is the same as that of [APT's]

CRITICAL COVER® products." SAC ¶ 70. The legal basis for these claims is that without

protection against such implied passing off, VWR "could use an established mark," such as

CRITICAL COVER®, "to create confusion as to a product's source thereby receiving a 'free ride

on the goodwill' of the established mark." *Checkpoint Sys.*, 269 F.3d at 294-95. But whether

these statements are likely to confuse is not an issue that can currently be resolved.

Still, VWR argues that "[a] high level of buyer sophistication can be indicative of the

absence of likelihood of confusion," and argues that APT's customers, who are "sophisticated

purchasers, such as hospitals and medical facilities, purchase supplies only upon the most careful

consideration." VWR Mot. Dismiss at 44-45. VWR also argues that the proximate cause of

APT's harm has nothing to do with the trademark, but instead with its failure to retain any

distributors other than VWR. Both of these contentions may yet have merit; as VWR points out,

the Third Circuit Court of Appeals explained in *Checkpoint Systems, Inc. v. CheckPoint Software

Technologies, Inc.*, that "[w]here the relevant products are expensive, or the buyer class consists

of sophisticated or professional purchasers, courts have generally not found Lanham Act

violations." 269 F.3d at 284. But while the *Checkpoint* Court put considerable weight on this

factor, *see id.* at 284-86, the case before it was an appeal from the district court's non-jury *trial*,

*see id.* at 278; *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 104 F. Supp. 2d 427,

468 (D.N.J. 2000), *aff'd*, 269 F.3d 270. As the procedural posture of *Checkpoint* suggests, the

motion to dismiss stage is not the appropriate juncture at which to resolve these factbound issues,

even if APT allegations, as VWR points out, seem to establish that its customers are

sophisticated. *See* SAC ¶ 13 ("CRITICAL COVER® products are used [in] environments,

typically in manufacturing or scientific research settings . . . ."); SAC ¶ 24 ("Many customers of

protective apparel do not permit the use of unqualified products in their clean rooms. . . . For

larger customers, the qualification process can take significant time and resources before a

product is qualified for use in their clean room."). Moreover, consumers' "sophistication" is one

factor, albeit one that itself may demand closer comparative analysis, and though it may be

important, it must be considered—at the appropriate stage of the litigation—along with the other

factors listed above. *See Checkpoint Sys., Inc.*, 269 F.3d at 284-85; *see also A&H Sportswear*,

237 F.3d at 225 ("The court concluded that the products' consumers were likely to be

sophisticated, and weighed this factor in favor of the defendants. . . . [T]here are no hard and fast

rules for this determination . . . . We find no error in the District Court's conclusion that this

factor weighs in favor of Victoria's Secret.").


### F.      Whether XXPC Is a Necessary Party Requiring Joinder Under Federal Rule of Civil Procedure Rule 19

VWR raises one final argument as to why APT's suit against it cannot proceed. Under

Federal Rule of Civil Procedure 19, it argues, XXPC is a necessary party that must be joined,

and, if XXPC cannot be joined, the case must be dismissed under Rule 12(b)(7). The Court

disagrees that XXPC is a necessary party and therefore declines to dismiss any of APT's claims

on this basis.

Rule 19 is broken into two main subparts. Rule 19(a) provides, in pertinent part:

**(a) Persons Required to Be Joined if Feasible.**

> **(1) *Required Party.*** A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

>> **(A)** in that person's absence, the court cannot accord complete relief among existing parties; or

>> **(B)** that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

>>> **(i)** as a practical matter impair or impede the person's ability to protect the interest; or

>>> **(ii)** leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a). Rule 19(b), in turn, lays out the standard to be applied "[i]f a person who is

required to be joined if feasible cannot be joined"—i.e., whether "the action should proceed

among the existing parties or should be dismissed." *Id.* 19(b). As the Supreme Court has

explained, if an absent third party is not necessary under Rule 19(a), that is the end of the

inquiry, and Rule 19(b) is inapplicable. *See Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 8 (1990) (per curiam) ("Here, no inquiry under Rule 19(b) is necessary, because the threshold requirements of Rule 19(a) have not been satisfied. As potential joint tortfeasors with Synthes, Dr. LaRocca and the hospital were merely permissive parties. . . . .").

VWR argues that XXPC is a necessary party under Rule 19(a) because "XXPC has an undeniable interest in clearing its own name and continuing its relationship with VWR, both of which qualify it as a necessary party under Federal Rule of Civil Procedure 19(a)(1)(B)(i)." VWR Mot. Dismiss at 48. VWR's primary contention is that because APT "has accused XXPC of stealing its trade secrets and breaching its alleged confidentiality agreement . . . XXPC's interest in clearing its name is more than sufficient to qualify it as a necessary party." *Id.* Because "a finding for [APT] assumes that XXPC breached its contractual obligations to [APT] and misappropriated [APT's] alleged trade secrets," VWR argues, "XXPC is a necessary and essential party that has a substantial interest in the outcome of this litigation." *Id.* at 49.

But VWR's assertion of XXPC's purported interest is not enough to require XXPC to be joined as a necessary party without which this litigation cannot proceed. Although VWR vigorously disputes it, the fact of the matter is that APT's allegations, taken as true, simply identify XXPC as a joint tortfeasor with VWR.

As its language indicates, Rule 19(a) in fact prescribes several inquiries. Under Rule 19(a)(1)(A), the court asks whether, in the absence of the party that the movant seeks to join, it can "afford complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A); *see Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 405 (3d Cir. 1993) ("[This] inquiry is limited to whether the district court can grant complete relief to the persons already parties to the action. The effect a decision may have on the absent party is not material."). And if the law

48

prescribes joint and several liability between the moving defendant and the absent third party the defendant seeks to join, then the absent party "is not a necessary party under subsection (a)(1)" because "complete relief [can] be granted" without the absent party's presence. *Janney*, 11 F.3d at 406. "It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple*, 498 U.S. at 7.

Although VWR does not rely on Rule 19(a)(1)(A), the Court must conduct this preliminary analysis because it shows how VWR's argument under 19(a)(1)(B) is an attempted end-run on the general rule that the plaintiff gets to decide who among alleged joint and several tortfeasors to sue. There is no indication that joint and several liability does not apply to misappropriation of trade secrets. *See Fishkin v. Susquehanna Partners*, No. 03-3766, 2007 WL 853769, at *3 (E.D. Pa. Mar. 19, 2007) ("Other Pennsylvania misappropriation cases, although not expressly describing misappropriation liability as joint and several, suggest that it is, upholding liability determinations where several defendants are described as liable for a single award of money damages. Commentators on trade secret law also suggest that, in general, liability for misappropriation claims is joint and several." (citations omitted)); *see also, e.g.*, *Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V.*, 391 F.3d 871, 877 (7th Cir. 2004) ("Under the principle of joint and several liability, which governs not only the common law tort of misappropriation of trade secrets but also the federal statutory tort of copyright infringement, the victim of a tort is entitled to sue any of the joint tortfeasors and recover his entire damages from that tortfeasor." (citations omitted)); *CC Investors Corp. v. Raytheon Co.*, No. 03-114, 2005 WL 81591, at *3 (D. Del. Jan. 7, 2005) ("As joint-tortfeasors for the misappropriation of trade secrets, any liability between Mr. Carr and CCI would be joint and several, and therefore, complete relief can be granted in the absence of the joinder of Mr. Carr." (footnote omitted)).

Indeed, "[t]he mere fact, however, that Party A, in a suit against Party B, intends to introduce evidence that will indicate that a non-party, C, behaved improperly does not, by itself, make C a necessary party." *Pujol v. Shearson Am. Exp., Inc.*, 877 F.2d 132, 136 (1st Cir. 1989); *Janney*, 11 F.3d at 409 (quoting this language from *Pujol* with approval).

If the gravamen of APT's allegations is that XXPC and VWR are joint tortfeasors, there is no basis under Rule 19(a)(1)(A) for finding that XXPC is a necessary party. And the flipside is that if XXPC and VWR are *not* joint tortfeasors, then VWR "could only be held liable for [its] own [tortious conduct], not the [tortious conduct] of others. Thus, there would not be any need for a hypothetical second action for contribution or indemnification. Thus, without joint and several liability, there may be complete relief accorded between those already parties." *Intercept Sec. Corp. v. Code-Alarm, Inc.*, 164 F.R.D. 215, 217 n.1 (E.D. Mich. 1995).

The import of this reasoning is more wide-ranging, however. As observed, VWR's primary argument is that XXPC is a necessary party under Rule 19(a)(1)(B)(i), which requires that the absent party sought to be joined "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest," Fed. R. Civ. P. 19(a)(1)(B)(i). But just what is this interest? "[C]learing its own name and continuing its relationship with VWR" are the interests VWR offers. VWR Mot. Dismiss at 48.

Leaving to one side the issue of whether the Rule's plain text permits the moving defendant to invoke the absent party's interest in vindication or the like, *see ConnTech Dev. Co. v. Univ. of Conn. Educ. Properties, Inc.*, 102 F.3d 677, 683 (2d Cir. 1996) (holding that the absent party must claim the interest: "UCEPI's self-serving attempts to assert interests on behalf of Connecticut fall outside the language of [the Rule], and thus cannot be the basis for UCEPI's

necessary party argument"), the Court observes that the bar set by the Third Circuit Court of Appeals is higher than VWR can clear. As the Court of Appeals has explained, an absent party cannot be the victim of later issue preclusion precisely because it is absent, and the speculative possibility that the Court's decision, in its absence, will create precedent unfavorable to the absent party does not "justify a holding that [the absent party] is a 'necessary' party under" Rule 19(a)(1)(B)(i). *Janney*, 11 F.3d at 407. Applying the same reasoning here compels the conclusion that where the court is "unable to say with any assurance that a decision in [APT's] action against [VWR] will be likely to impair or impede [XXPC's] ability to defend itself in [another action] or to obtain indemnity or contribution from [VWR]." *Id.* Indeed, because APT cannot doubly recover, the only risk XXPC is exposed to by any of this litigation is that VWR will be found liable and will in turn sue XXPC as a joint tortfeasor. Such a risk is not enough for invocation of Rule 19. *See Huber v. Taylor*, 532 F.3d 237, 250 (3d Cir. 2008) ("[T]he requirements of Rule 19(a) are not satisfied simply because a judgment against Defendants in this action might set a persuasive precedent in any potential future action against [the absent parties sought to be joined].").

      VWR's argument boils down to the contention

> that to prove misappropriation by [VWR], [APT] will have to show that [XXPC] broke its contract with [APT] by revealing [APT's] trade secrets to [VWR] without authorization. But that is true in any case of tortious interference with contract. Just as in the closely related case of joint tortfeasors, there is no rule that you cannot sue the interferer without also suing the party to your contract whom the defendant inveigled into breaking the contract. The distinction . . . between an indispensable party and an indispensable witness is pertinent here. When a plaintiff is harmed by the acts of several persons, all may be essential sources of evidence in a suit against any. But if this possibility automatically required that all be joined, the rule that joint tortfeasors are not by virtue of their jointness indispensable parties, and the extension of that principle to the case in which the plaintiff is harmed by a breach of contract procured by a tortfeasor whom the plaintiff has sued without joining the contract breaker, would be overthrown.

*Salton*, 391 F.3d at 880 (citations omitted).

VWR's citations to district court cases that ignore and or/predate *Janney* and *Huber* are unavailing. The Third Circuit Court of Appeals has been explicit that the impairment or impediment of an absent party's interest is insufficient to render that absent party necessary under Rule 19(a)(1)(B)(i) if that interest is no more, as here, than preventing the creation of precedent that may be used against it because it is a joint tortfeasor. Of course, issues of claim preclusion and the like remain sufficient, but they are not at issue here.

Finally, to the extent that VWR's argument (which is otherwise undeveloped) is that XXPC has an interest in "continuing its relationship with VWR," that suggestion is unconvincing. For one, APT has not sought injunctive relief, as VWR has acknowledged. *See* VWR Reply at 13-14. Still, VWR continues to argue that XXPC's interest "would be the same regardless of the type of relief sought." *Id.* at 14. But again, "the Third Circuit, in *Huber*, has already determined that it is inappropriate for a court to look at privity, for issue preclusion purposes, and the collateral estoppel effect on, or of, a potential future action when making a determination of the necessity of a party that is based on the absent party's interest, under Rule 19(a)(1)(B)(i)." *Graco, Inc. v. PMC Global, Inc.*, 73 Fed. R. Serv. 3d 52 (D.N.J. 2009). To allow a joint tortfeasor defendant to gain extra protection simply because it has a contract with an absent party providing for the alleged commission of a tort makes no sense. Second, it is merely speculative that XXPC's relationship with VWR will be jeopardized. Just as the *Graco* Court reasoned that an expired noncompete agreement did not serve as a bar to the absent party's employment with the defendant, "so long as [the absent party] works in a lawful manner, and does not disclose Graco trade secrets, if any," *id.* at 52 n.4, here, VWR and XXPC could continue their manufacturing and distribution agreement without infringing on APT's alleged

trade secrets—whether by using different methods, if APT ultimately prevails on that count, or by continuing as before, if APT's method is found not to be a trade secret.

For these reasons, XXPC is not a necessary party under Rule 19(a), and the joinder inquiry is at an end.

**CONCLUSION**

For the reasons discussed above, VWR's Motion to Dismiss will be granted in part and denied in part. Counts II and IV, for breach of contract and tortious interference with an existing contractual relationship, are dismissed. Counts I, III, and V, for misappropriation of trade secrets, unjust enrichment, and Lanham Act false advertising and false designation of origin, survive. VWR's contention that XXPC is a necessary party that must be joined under Federal Rule of Civil Procedure 19 is rejected.

An Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge