# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **ALPHA PRO TECH, INC.,** | : |  |
| **Plaintiff,** | : | **CIVIL ACTION** |
| **v.** | : |  |
|  | : | **NO. 12-1615** |
| **VWR INTERNATIONAL, LLC,** | : |  |
| **Defendant.** | : |  |

## MEMORANDUM

PRATTER, J.                                                    OCTOBER 11, 2016

Alpha Pro Tec, Inc., ("Alpha") alleges that VWR International, LLC ("VWR") has misappropriated Alpha's trade secrets used in its manufacture of certain nonwoven, disposable laboratory apparel. The products at issue include lab coats, aprons, frocks, as well as shoe and boot covers. Such garments are used in "clean-rooms" in the life sciences, advanced materials, chemical, and manufacturing industries. In support of its claims, Alpha has identified three expert witnesses it proposes to call to testify at trial: Christopher Louisos, Danny Montgomery and Neil Beaton. VWR proposes to call Gregory Heiland to testify regarding certain aspects of the disposable laboratory apparel industry.

VWR has moved to exclude Messrs. Louisos, Montgomery and Beaton as witnesses, pursuant to Federal Rule of Evidence 702. (Doc. Nos. 98, 99 and 100). Alpha has moved to exclude Mr. Heiland. (Doc. No. 102). Both parties have submitted briefing in opposition to the respective motions. The Court heard oral argument on the *Daubert* motions. For the reasons outlined below, the Court will grant VWR's motion to exclude the testimony of Mr. Louisos, will grant in part and deny in part VWR's motions to exclude Mr. Montgomery and Mr. Beaton, and will deny Alpha's motion to exclude Mr. Heiland.

# I. STANDARD OF REVIEW

The trial judge has a special obligation and challenge under Federal Rule of Evidence 702 to ensure that any and all expert testimony is not only relevant, but reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Rule 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The purpose of the inquiry is to ensure that the expert, whether basing his testimony on professional studies or personal experience, is employing the level of intellectual rigor which characterizes the practice of an expert in the relevant field. *Kumho Tire*, 526 U.S. at 152. The Third Circuit Court of Appeals has explained that Rule 702 embodies "a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted). "The proponent of the expert testimony bears the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence." *Dalton v. McCourt Elec. LLC*, 112 F. Supp. 3d 320, 325 (E.D. Pa. 2015) (citing *Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999)); *accord In re Tylenol (Acetaminophen) Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 12-07263, 2016 WL 4005765, at *2 (E.D. Pa. July 26, 2016). While specialized knowledge is a requirement, the basis of such knowledge can be "practical experience as well as academic training and credentials." *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 328 (3d

Cir. 2002) (Alito, J.) (noting that the specialized knowledge requirement has been construed "liberally") (citing *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)).

An expert witness is required, under Rule 26 of the Federal Rules of Civil Procedure, to provide certain disclosures enumerated under the Rule. Failure to comply with this disclosure obligation empowers the Court to preclude use of the proposed testimony. The extent of these disclosures, however, may depend upon whether the expert has been specifically retained to provide expert testimony. Unlike a retained expert, a witness who is not retained to provide expert testimony—such as a plaintiff's treating physician might be in a prototypical personal injury tort case—is not required to submit a written report laying out a complete statement of his opinions and the reasons for them. *See* Fed. R. Civ. P. 26(a)(2)(C). As described in the Rule's Advisory Committee Notes, the reporting requirements under Rule 26(a)(2)(C) are "considerably less extensive than the report required by Rule 26(a)(2)(B)." *Little Hocking Water Ass'n, Inc. v. E.I. DuPont de Nemours & Co.*, No. 2:09-CV-1081, 2015 WL 1105840, at *3 (S.D. Ohio Mar. 11, 2015) (citing Rule 26, Advisory Committee Notes). Such a non-retained expert must, however, still enumerate the topics he intends to opine on if he is to be a witness at trial, and offer a description of what his opinions will be.

## II.     ANALYSIS

### A.  Motion to Exclude Christopher Louisos (Doc. No. 99)

The Court will first address the defense motion to exclude the testimony of Christopher Louisos.[1] The defendant initially moved to exclude the testimony of Mr. Louisos in July 17,

---

[1] Consideration of this motion comes only after a protracted and intense series of filings, depositions, hearings, and general obfuscating by both sides. Yet now, despite the time and treasure spent litigating this issue, the Court has no clearer a picture of Mr. Louisos's qualifications or the reliability of his proffered opinions. This comes as little surprise, given that such sound and fury signifying, if not nothing, than at least very little, seems to characterize the entire prosecution and defense of this matter. While this may appear to be largely the doing of the plaintiff, keeping with the Shakespearean metaphor, to the extent any plagues ought to be assigned, all houses involved are deserving. *See* William Shakespeare, Romeo and Juliet Act 3 Sc. 1.

2015, arguing that his expert report failed to meet the mandatory disclosure requirements of Federal Rule of Civil Procedure 26(a)(2)(C). The "report" in question provided only a short description of each general topic on which he intended to offer testimony. The plaintiff filed a response in opposition, arguing that Mr. Louisos, as a non-retained expert, was not obligated to provide a full-blown expert report, and that the limited material provided satisfied Rule 26. Several weeks later, however, the plaintiffs filed a supplemental report for Mr. Louisos. The defendant then filed a memorandum of law in support of the motion to exclude Mr. Louisos's testimony. The Court called for a hearing, during which the parties discussed both the motion to exclude Mr. Louisos's testimony and the plaintiff's motion to supplement the report. At that hearing, the Court gave permission for an additional deposition of Mr. Louisos followed by supplemental briefing. Both parties filed additional briefing and the Court again heard oral argument on the motion. Given that the arguments (and report) in question have changed, the Court will focus on the supplemental report, as well as the supplemental briefing, following Mr. Louisos's deposition.

The defendant raises two general arguments in support of excluding Mr. Louisos's testimony. First, that Mr. Louisos is not qualified to offer opinions on branding, trademark confusion, customer reactions, business ethics, or trademark law; second, that his opinions are inadmissible because they are not based upon the application of a reliable methodology.

### i. Contents of August 28, 2015 Supplemental Expert Report

Consideration of the parties' arguments requires a brief description of the contents of Mr. Louisos's August 28, 2015 Supplemental Expert Report. Mr. Louisos is employed by Alpha. His job responsibilities consist of managing Alpha's sales force and marketing team, and generally overseeing the relationship between Alpha and its distributors. Based upon this

experience, he proposes to offer testimony regarding various aspects of the disposable garment industry generally, as well as Alpha's business and the company's interactions with VWR.

The report itself contains three categories of proposed testimony. The first category is characterized as "expert testimony offered to explain, practice, custom and usage." Both the report and the plaintiff's briefing in opposition to the motion claim that this testimony is not expert opinion, but rather descriptions which will be helpful for the jury to understand his later opinions. Mr. Louisos proposes to testify from his own experience, regarding the cleanroom environments in which Alpha's products are used. He proposes to testify regarding utility of relying on distributors and the "private label" sales strategy which allegedly characterized the relationship between Alpha and VWR. He proposes to discuss "various sales tactics" which he claims have been employed in the disposable garment market.

This leads to the second category of testimony contained in the report. Mr. Louisos proposes to offer three specific opinions at trial, namely that:

> 1. Alphas' Critical Cover line of apparel and related trademarks and trade names had value in the relevant markets from 2000 through present, which value was not based upon the addition of VWR's name to the trademarks. . .;
>
> 2. VWR's sales and other tactics employed in pursuit of the APT Conversion Plan were improper, unethical and/or unprofessional. . .;
>
> 3. There was confusion or likelihood of confusion in connection with the sale of VWR's Protection Apparel Products as replacements for Critical Cover Products.

Louisos Supp. R. at 7-10. In the report, Mr. Louisos provides some limited explanation of the reasoning behind these opinions. As to the first, he states that his opinion is based upon his anecdotal experience working with customers. With regards to VWR's tactics, he cites to his review of VWR documents and testimony, and states VWR's conduct violates industry standards and VWR's code of conduct. Finally, as to customer confusion, he bases his opinion on anecdotal statements by customers as well as Alpha's own, apparent, confusion.

The last category of testimony contained in Mr. Louisos's report is his "application" of the factors set out in *Interface Corporation v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983), to the facts of this case. Using this case as a framework, he proposes to opine regarding (1) the degree of similarity of the Alpha and VWR marks, (2) the strength of Alpha's marks, (3) the price of Alpha's products, and other facts indicative of care and attention expected of consumers when making a purchase, (4) the length of time VWR used Alpha's marks without confusion, (5) the intent of VWR in adopting the marks, (6) the existence of actual confusion, (7) the channels through which Alpha's products are sold, (8) similarity of the target markets for Alpha and VWR products, and (9) the relationship between the Alpha and VWR products.

### ii. Mr. Louisos's Qualifications

The defendants first challenge whether Mr. Louisos is qualified to render any of his proposed opinions. "Rule 702 has two major requirements. The first is that a witness proffered to testify to specialized knowledge must be an expert." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994); *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The courts do not impose "overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." *Paoli*, 35 F.3d at 741. Nevertheless, "the party offering the expert must demonstrate that the expert has the necessary expertise to provide reliable evidence." *Ferris v. Pennsylvania Fed'n Bhd. of Maint. of Way Employees*, 153 F. Supp. 2d 736, 743 (E.D. Pa. 2001) (citing *Burton v. Danek Medical, Inc.*, 1999 WL 118020 (E.D. Pa. Mar. 1, 1999) (concluding that neurologist is not qualified to testify about the causation of injury in a case involving spinal fusion surgery where the neurologist had no experience or training in the area of spinal surgery).

The Court will address the question of Mr. Louisos's qualifications as to the three categories of testimony contained in his report somewhat out of order. First, with regards to the "opinions" that Mr. Louisos proposes to offer, the Court finds no basis whatsoever to conclude that Mr. Louisos has any experience or technical knowledge relevant to any of the proposed opinions. As to his assessment of the value of the various trademarks at issue, there is no evidence indicating he has any experience in the area of trademark valuation. The only qualifications offered relate to Mr. Louisos's experience as a salesman and manager while at Alpha. There is no explanation provided by the plaintiff as to how this experience qualifies him to testify as to the market value of Alpha or VWR's trademarks or brand.

Similarly, the plaintiff has offered no evidence to explain that Mr. Louisos possesses any expertise to offer opinions on the "ethical standards" which govern the disposable garment industry generally or VWR's compliance with its own code of conduct specifically. The plaintiff has pointed to no evidence that standardized mandatory or voluntary ethical standards even have been promulgated in the industry or that Mr. Louisos has any familiarity with such standards, should they exist.

Finally, there is no evidence in the record that Mr. Louisos has experience in the areas of statistical analysis, consumer surveying, or marketing sciences. Mr. Louisos may have had conversations with Alpha customers, i.e., hearsay, who expressed "confusion" as to the difference between Alpha and VWR marks, but there is no basis in the record to allow for the conclusion that Mr. Louisos has any expertise or specialized knowledge necessary to extrapolate from these anecdotal hearsay conversations an assessment of consumer confusion generally. For these reasons, the Court finds that the three opinions proffered in Mr. Louisos's expert report are inadmissible.

While presented separately from his enumerated "opinions", Mr. Louisos also proposes to testify that VWR's actions caused consumer confusion in the market using nine factors set out in the Third Circuit's decision in *Interface Corporation v. Lapp, Inc.* The first problem with this proposed testimony is that an expert witness is prohibited from rendering a legal opinion. *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (citing *United States v. Leo*, 941 F.2d 181, 195–96 (3d Cir.1991). Allowing Mr. Louisos to testify regarding the applicability of the *Lapp* factors, as such, would constitute an opinion that these factors are controlling on the jury's analysis. It is the duty of the Court, not a witness, to tell the jury what law should be applied. This proposed feature for Mr. Louisos is a blatant effort to usurp the Court's role.

Moreover, even if this testimony were to be allowed generally, Mr. Louisos is not a lawyer, nor does he appear to possess any experience in the area of trademark law. He has no basis to testify that these factors are actually relevant. Based upon the deposition testimony, it appears that Mr. Louisos himself has no independent familiarity with the *Lapp* factors, and was simply provided them by counsel. At trial, counsel may be allowed to argue that these factors are relevant to jury's consideration of consumer confusion, but the plaintiff will not be permitted to have Mr. Louisos serve as the mouthpiece for such argument.

The final category of testimony to be proffered by Mr. Louisos does not actually involve expert opinion. Rather, Mr. Louisos seeks to testify about the disposable garment industry. To the extent that Mr. Louisos simply seeks to define certain terms used in the industry, or testify as to his firsthand knowledge of business strategies employed by actors in the industry, this would not constitute testimony in the form of an opinion, and therefore does not implicate Rule 702. [2]

---

[2] This does not imply necessarily that Mr. Louisos's factual testimony described in the report is otherwise admissible. Much of the factual testimony he has identified in his report appears based upon impermissible hearsay. If this is the case, his testimony is still susceptible to exclusion through motions *in limine* or objections at trial. But such issues are left for another day.

Based upon the foregoing, the Court will grant the defendant's motion to exclude Mr. Louisos's expert testimony. Mr. Louisos may offer testimony regarding his first-hand knowledge of relevant events and briefly may give background information about the industry generally in order to supply modest industry landscape for the jury, but he may not offer expert testimony in the areas of trademark valuation, trademark law, business ethics, or consumer confusion.[3]

### B. Motion to Exclude Danny Montgomery (Doc. No. 100)

The defendant also moves to exclude the expert opinion testimony of Danny Montgomery. Like Mr. Louisos, Mr. Montgomery is a senior executive working for Alpha. He proposes to testify regarding the development and manufacture of protective apparel products, such as the garments at issue in this litigation, and he has provided a brief report describing his qualifications. The defendant argues that the opinions contained in the report are not based upon the application of any reliable methodology and should therefore be excluded. For the reasons outlined below, the Court will grant the motion in part and deny it in part.

### i. Mr. Montgomery's Proposed Expert Opinions

In his expert report, Mr. Montgomery states that he intends to testify regarding "the development, research and manufacturing of protective apparel products, including the products at issue in this case." Montgomery Rept. at 3. Generally, he states that he intends to testify regarding the research and development of coated fabric materials, the meaning of technical terms such polymers, polyethylene, polypropylene, or elastomer, the design and operation of equipment used to manufacture coated fabrics, the conversion of materials into finished products, manufacturing in China and India generally, uses for the finished products, tests and

---

[3] Because the Court holds that Mr. Louisos lacks the qualifications to offer the proposed expert testimony, the Court need not move on to the second step of the analysis and evaluative the reliability of those opinions. Nevertheless, the Court notes that much of the expert opinion Mr. Louisos proposes to offer appears to lack any methodology whatsoever.

specifications related to the products at issue, and the use of Alpha's trade secrets in the products in question. Specifically, he sets out seven opinions. These are: (1) "Alpha's proprietary formulas and process used to develop its products were not generally known or readily discoverable"; (2) "Neither Xinfa, nor VWR, reverse engineered any Critical Cover products"; (3) "Xinfa and VWR used Alpha's trade secrets to produce VWR's Protection Apparel"; (4) "Despite VWR's use of Alpha's trade secrets, VWR's finished products are not and never have been the same as Alpha's products"; (5) "Alpha is and was the manufacturer of all of the Critical Cover products"; (6) "VWR's substitute material for Comfortech and Microbreath is not better than Alpha's material and the substitution did not result in improvements to quality"; and (7) "Alpha utilized practices reasonably necessary to protect its trade secrets under the circumstances." Montgomery Rept. at 4-5.

Mr. Montgomery states that these opinions are based upon his experience in research and development of polymer-based products, as well as certain "tests" he performed on the products at issue. He states in his report that he has worked in the film extrusion, and extrusion coating field since 1968. During this time, he states that he has had hands-on experience with regards to all aspects of the manufacturing process and developed extensive knowledge of chemical compositions, processes and equipment necessary to produce the products at issue in this litigation. Since 1992 he has worked to develop and manufacture material used in protective apparel garments. This included developing processes for coating spun bond polypropylene and other polymer based fabrics used in the products at issue in this case.

The defendant's motion makes four arguments challenging the admissibility of Mr. Montgomery's opinions. The Court will address each in turn.

### *ii. Use of Alpha's Trade Secrets in VWR's Products*

Principally, the defendant argues that Mr. Montgomery should not be permitted to offer his opinion that VWR's products incorporated Alpha's alleged trade secrets because this opinion is based on the application of an unreliable methodology. It contends that Mr. Montgomery's failure to employ any sort of chemical analysis of VWR's product precludes his testifying that the VWR products incorporated Alpha's trade secret. At his deposition, Mr. Montgomery testified that he did not perform a chemical analysis of VWR's products to determine that the product at issue incorporated Alpha's trade secret. Rather he testified that he visually inspected the VWR products and, based upon this visual inspection, determined VWR's products exhibited certain characteristics of the Alpha trade secret. Notably, however, Mr. Montgomery also admitted during his expert witness deposition that visual or tactile inspection would require lab tests to verify the chemical composition of the materials in question:

> A. . . . You know, if you've – if you've put me [sic] three pieces of nonwoven fabric down, polypropylene. This one is coated with homopolymer propylene, this one coated with low density polyethylene, and this one is coated with a polymer with an elastomer in it; probably within three or four minutes I can tell you which is which. *Now you'll need a lab to confirm it*, but I can – I can generally take the matter, I can perform a few items on the material. And based upon the properties, you know, I'm not – I'm not just looking at the material, I'm look at how the properties perform when I – when I exert certain things to the material, then I can with – with fairly high degree of accuracy, I can tell you well, this one is – this one is coated with polypropylene homopolymer. This one is coated with low density and this one is using elastomer.

> Q. So, now, you did not use an independent testing service to test or compare VWR's products to APT's products?

> A. No.

Montgomery Expert Dep. at 58-59. (emphasis added). Later in the same deposition, Mr. Montgomery admitted that submitting the relevant material to a lab test to determine its composition would be a more "precise" method.

Q. So if you were to take anybody's shoe cover, you would be able to tell pretty immediately whether or not it contained an elastomer?

A. Right.

Q. And you would be able to –

A. I would think so yes.

Q. And you would be able to tell whether it was made of polypropylene or polyethylene?

A. Yes.  And a lab guy might could do that too, but it might take two or three days for the lab guy to come back, but this would be like more –

Q. More scientific?

A. – his would *be more like precise*.

*Id*. at 123 (emphasis added); *accord id*. at 124 ("Look, I'm not knocking lab tests, they're great. I embrace technology.  But, you know, sometimes you've got to have – you know kind of what's going on and then you can have the lab verify.").

In response, Alpha provides no substantive justification for Mr. Montgomery's reliance on a visual/tactile inspection of the VWR products rather than a chemical analysis.  All that is provided is a conclusory assertion that "Mr. Montgomery's methodology, while not based upon chemical analysis, is reliable."  Pl. Br. at 3.  There is no testimony or other authority cited indicating that Mr. Montgomery's method is used by other experts in the industry or relied upon in any other circumstances.

The objective of *Daubert's* gatekeeping function is to ensure that expert testimony is based upon reliable methods and is relevant to the matters at issue in the case.  "An expert's opinion is reliable if it is "based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000) (citing *In re Paoli R.R. Yard*

*PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994)). The hurdle that the proponent of expert testimony must overcome is not particularly high and exclusion of expert testimony is typically the exception and not the rule. *Keller v. Feasterville Family Health Care Ctr.*, 557 F. Supp. 2d 671, 674 (E.D. Pa. 2008) ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (citing Fed. R. Evid. 702 (advisory committee notes)); *see Daubert*, 509 U.S. at 595). Nevertheless, the Court has an obligation "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152; *Elcock*, 233 F.3d at 746.

Here the Court is not satisfied that, in formulating the opinions he seeks to articulate to the jury, Mr. Montgomery employed the same methodology and rigor he would have relied upon had he been exercising his expertise in the context of his work for Alpha. He essentially admitted as much in his deposition when he acknowledged that lab testing was necessary to verify his preliminary visual conclusions and that the results of such testing would be more "precise." Moreover, when faced with this *Daubert* challenge, plaintiff's counsel was unable to muster any defense of the expert, aside from a conclusory assertion that their expert's methodology is reliable. As proponent of Mr. Montgomery's testimony, it Alpha's burden to show that such testimony is relevant and reliable. *See Oddi v. Ford Motor Co.,* 234 F.3d 136, 144 (3d Cir. 2000) ("The proponent must satisfy this burden 'by a preponderance of proof.') (citing *Daubert*, 509 U.S. at 593 n. 10); *United States v. Williams*, 95 F.3d 723, 729 (8th Cir. 1996) ("It is the burden of the party offering the expert testimony to lay a foundation for its admission."); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir.),

("[T]he party presenting the expert must show that the expert's findings are based on sound science. . . .").

It may well be that in some cases, in some fields of endeavors, and for some people, a "seat of the pants" assessment is good enough to loose a witness on a jury, but this is not the case, this is not the field, this is not the witness, and this is not the Court for that gambit. For this reason, the Court finds that Mr. Montgomery's testimony regarding the use of Alpha's trade secret in VWR's products is inadmissible.

### iii. Alpha's Trade Secret is Readily Ascertainable

Next, the defendant challenges Mr. Montgomery's assertion that Alpha's trade secret is not readily ascertainable. In his expert report, Mr. Montgomery states that Alpha's formulas and processes used to develop its products, which constitute the alleged trade secret at issue, were not generally known or readily discoverable.

As a preliminary matter, the Court notes that, even after several years of litigation, it does not appear as if the plaintiff can consistently articulate what it is claiming the trade secret to be. The plaintiff has stated that the trade secret is "what Mr. Montgomery developed and it consists of a secret blend of resins." February 2, 2016 Hr. Tr. at 28. In his report, Mr. Montgomery characterizes the secret as "Alpha's propriety formulas and processes." Montgomery Rept. at 4. During his initial deposition, he elaborated that the alleged trade secret: "[t]he concept of putting an elastomer into a homopolymer polypropylene was part of our trade secret. That's what makes the whole process work." July 9, 2015 Montgomery Depo at 80; *see also* September 3, 2016 Montgomery Depo at 60-61.

At the hearing on the *Daubert* motions, however, plaintiff's counsel took a somewhat broader approach when characterizing the alleged trade secret:

It is. It has several parts, but it's one trade secret. It's secret resins blended in a secret way used in specially-modified equipment. The settings on the equipment, the temperatures, tolerances, everything, if they're not right, it doesn't work. Any nobody had been able to do that as of 2009. We had the only product on the market that had those qualities.

February 2, 2016 Hr. Tr. at 28-29.

Regardless of how the trade secret is characterized, the defense arguments in favor of excluding Mr. Montgomery's testimony as to how readily ascertainable the trade secret would be to the weight of this evidence, rather than its admissibility. Notably, the defendant has not challenged Mr. Montgomery's credentials or experience in the field of developing products such as those at issue in this litigation. Based upon his experience, Mr. Montgomery can testify as to his understanding of the development and intricacy of the Alpha trade secret. Likewise, the defendant will be free on cross-examination to attack the weight such testimony should be given in light of examples from the marketplace of other competing products utilizing similar processes and chemical formulations. Consequently, the Court will deny the motion as to this proposed opinion.

### iv. Alpha is the Manufacturer of the Products in Question

The third "opinion" in Mr. Montgomery's report is his assertion that Alpha is the "manufacturer" of the shoe covers during the time that Alpha had a relationship with Xinfa.

Strictly speaking, the dispute here does not appear to trigger expert opinion, as such, but rather calls upon Mr. Montgomery to testify regarding a factual issue which appears to be within his first-hand knowledge, given his position at Alpha and involvement in the manufacturing of the products at issue. Given this, the strength of the defendant's arguments that Mr. Montgomery's characterization of Alpha as a "manufacturer" is not an issue for the Court to decide here, but rather a dispute of material fact to be presented to the jury. Based upon the

defendant's arguments, there seem to be serious inconsistencies which will be used in an effort to contradict Mr. Montgomery's characterization. But this alone does not allow the Court to exclude it here. Consequently, the Court will also deny the motion as Mr. Montgomery's characterization of Alpha as a manufacturer.

### v. *Alpha's Steps to Protect its Trade Secrets*

Lastly, the defendant argues that Mr. Montgomery should not be allowed to testify that "Alpha utilized practice reasonably necessary to protect its trade secrets," because he has no expertise in the areas of security, law, human resources or any other field typically associated with the protection of trade secrets. *See* Montgomery Rept. at 5. Based upon the review of the report and the record evidence made available, the Court agrees with the defendant on this point.

The plaintiff fails to provide any basis to conclude that Mr. Montgomery is qualified to offer an expert opinion as to the reasonableness of the steps taken to protect Alpha's trade secrets. The plaintiff simply argues that Mr. Montgomery has knowledge of the relevant steps that Alpha took to protect its trade secrets—namely the company's "oral confidentially" agreement the plaintiff claims was entered into with Mr. Fu—and that given this first-hand knowledge, Mr. Montgomery should be allowed to offer his opinion that these steps were reasonable. This argument is unpersuasive. To the extent he has first-hand knowledge, Mr. Montgomery is certainly able to provide factual testimony regarding what steps Alpha took. What is missing from the plaintiff's response is any basis to conclude that Mr. Montgomery has the experience to opine on whether those steps were *reasonable* under the circumstances. Based upon his report, Mr. Montgomery certainly appears to have substantial experience in the development of the processes and chemicals which apparently make up the trade secrets in question. But there is no evidence on the record—nor is there any basis for inference presented

by the plaintiff—to support a conclusion that Mr. Montgomery is qualified to offer an expert opinion as to whether the trade secrets he may or may not have developed for Alpha were adequately protected. Consequently, the Court will grant the defendant's motion as to this point.

## C. Motion to Exclude Neil Beaton[4] (Doc. No. 98)

The defendant also seeks to exclude the plaintiff's proposed damages expert, Neil Beaton. The defendant challenges two aspects of Mr. Beaton's report. First, the defendant argues that Mr. Beaton improperly included what is referred to as "convoyed sales" in his estimate of damages. Second, the defendant argues that Mr. Beaton's assumptions as to the nature of Alpha's and VWR's ongoing relationship, in the event this dispute did not arise, are speculative. The Court will address each argument in turn.

### i. Mr. Beaton's Proposed Expert Opinions

Mr. Beaton proposes to offer three opinions addressing separate categories of damages. First, he proposes to testify that Alpha suffered $27.3 million in lost sales through 2014 due to VWR's alleged unlawful conduct. Second, he claims Alpha suffered an additional $6.5 million in lost profits from reduced pricing through 2014 as a result of VWR's alleged unlawful conduct. Finally, he calculates VWR was unjustly enriched by $43.1 million, based on gross profits on sales on VWR products. Mr. Beaton calculates his damages estimate by determining the baseline for sales of Alpha products to VWR between 2004 and 2009. He assumes that, but-for VWR's conduct, sales would have continued at the same levels through 2014. Beaton Rept. at 8. To calculate damages for lost sales, he determined the difference between this baseline level,

---

[4] The Defendant does not challenge Mr. Beaton's credentials or general ability to offer an opinion on the damages allegedly suffered by Alpha. Mr. Beaton is a certified public accountant. He also has certifications in the areas of business valuation and financial forensics from the American Institute of Certified Public Accountants. He is employed as the Managing Director at Alvarez & Marshal Valuation Services, LLC, specializing in business and intellectual property valuations, mergers and acquisition support, litigation consulting and economic analysis. He has previously worked at Dun & Bradstreet.

actual sales to VWR and then offset this with mitigating sales to VWR end customers that Alpha retained through other distributors.  *Id.*

### ii.    *Convoyed Damages*

The first challenge to Mr. Beaton's expert report centers on his alleged use of a "convoyed sales" theory to calculate the total damages which Alpha claims it is entitled to recover.

"Convoyed sales" is a theory of damages taken from patent law.  *See e.g. Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1267 (Fed. Cir. 2008).  The term "convoyed sale" refers to the relationship between the sale of a patented product and a functionally associated non-patented product.  *Id.*  In instances when a patent covers only a single component part of a larger machine, the patent holder may recover infringement damages based upon the revenues from sales of the entire machine.  The patent holder must prove that the patent-related feature is the basis for the customer demand for the unpatented parts to which it seeks to extend its damages.  *Am. Seating*, 514 F.3d at 1268; *King Instruments Corp. v. Perego*, 65 F.3d 941, 956 (Fed. Cir. 1995).  In such instances, courts have applied what is referred to as the "entire market rule." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995).

A patentee needs to show that the entire value of the whole machine, as a marketable article, was "properly and legally attributable" to the patented feature.  *Id.*  The convoyed sales the plaintiff seeks to include in the damages calculation must be shown to "bear a functional relationship with the patented goods."  *Id.; King Instruments,* 65 F.3d at 956.    While this concept has been extended to sales of components which can be sold physically separate from the machine in question, the patented and unpatented components together must be components of a single assembly, or parts of a complete machine, or they together constituted a functional

unit. *Rite-Hite*, 56 F.3d at 1550*; see Velo-Bind, Inc. v. Minnesota Min. & Mfg. Co*., 647 F.2d 965 (9th Cir. 1981) (holding that a plaintiff could not recover for lost sales associated with non-patented paper products used in a patented machine, when defendant had been shown to have infringed on the machine patent). "Our precedent has not extended liability to include items that have essentially no functional relationship to the patented invention and that may have been sold with an infringing device only as a matter of convenience or business advantage." *Am. Seating*, 514 F.3d at 1267 (citing *Rite–Hite*, 56 F.3d at 1550).

While the defendant points out that the term 'convoyed sales' does not appear in Mr. Beaton's expert report, Mr. Beaton acknowledged in his deposition that he relied upon this theory when calculating Alpha's damages. The plaintiff, however, has come forward with no authority indicating that a convoyed sales theory is an appropriate methodology to be employed here. The only support they offer is the blatant assertion by Mr. Beaton in his deposition that his methodology is reliable. *See* Pl. Br. at 3. Nothing in either *Daubert* or the Federal Rules of Evidence "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "Admissibility [] depends in part upon 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *Oddi*, 234 F.3d at145 (citing *Paoli*, 35 F.3d at 743). Mr. Beaton articulates no connection between sales of products impacted by the trade secrets at issue and sales of other products. He even goes so far as to assert that he need not show any causal connection between the two. His inclusion of lost sales related to all of Alpha's products in his damages calculation appears totally devoid of any methodological support. Consequently, the Court will grant the defendant's motion and exclude Mr. Beaton's calculation of Alpha's lost sales.

### iii. *Speculation Regarding Alpha and VWR's Ongoing Relationship*

The defendant also argues that Mr. Beaton's opinion that Alpha and VWR's relationship would have remained the same after 2010, had the immediate dispute not arisen, is based upon speculation by Alpha management, which is contradicted by the record. In his report, when calculating revenue, Mr. Beaton assumes pricing and sales would remain the same from 2004 to 2009. He makes assumptions regarding the importance of distributors to end user purchases and that competitors would not introduce any non-infringing products in the market. He also assumes that, in the absence of the instant litigation, VWR and Alpha would maintain the same contractual relationship which existed prior to the litigation. As to each of these assumptions, the defendant cites to evidence which calls into question the reasonableness of such assumptions But these arguments do not address the methodology Mr. Beaton employed. "[W]here the methodology is reasonable and [the] data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder." *ART+COM Innovationpool GmbH v. Google Inc*., 155 F. Supp. 3d 489, 515 (D. Del. 2016) (citing *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed.Cir.2015).

The defendant's arguments—if valid—clearly provide ample ammunition for cross examination of Mr. Beaton. But they do not constitute a basis for exclusion of his testimony.

### D. Motion to Exclude Gregory Heiland (Doc. No. 102)

In addition to the three defense *Daubert* motions, the plaintiff has also filed a motion seeking to exclude the defendant's expert, Gregory Heiland. Because the motion itself is completely procedurally deficient, we need not address the substance of the plaintiff's arguments.

The Local Rules of the Eastern District of Pennsylvania set out the general requirements for any motion filed in this district. Specifically the rules state that "[e]very motion not certified as uncontested, or not governed by Local Civil Rule 26.1(g), shall be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion." E.D. Pa. R. Civ. P. 7.1(c). *Nelson v. Astra Merck, Inc.*, No. 98-1283, 1999 WL 357370, at *1 (E.D. Pa. June 3, 1999); *Griffin-El v. Beard*, No. 06-2719, 2009 WL 678700, at *3 (E.D. Pa. Mar. 16, 2009), *order corrected on reconsideration*, No. 06-2719, 2009 WL 1229599 (E.D. Pa. Apr. 30, 2009) (Restrepo, Magistrate J.).

As Judge Restrepo of the Third Circuit Court of Appeals—then a Magistrate Judge—explained in *Griffin-El,* "Courts in this jurisdiction have found that motions and memoranda of law that are not accompanied by citations to legal authority or adequate explanations of the bases for the party's arguments are legally deficient under Local Rule 7.1(c), which can warrant denial of the motion." *Griffin-El*, 2009 WL 678700, at *3. Judge Restrepo held that "[s]ince Defendants did not submit a brief, but instead stated their objections in a conclusory fashion without citation to relevant case law or Rules of Civil Procedure, their Motion for Reconsideration is legally deficient under Local Rule 7.1(c)." *Id.*

The Court here finds that Alpha's motion is similarly deficient. This after unceasing litigation over virtually every issue, big and small, in which the Court's expectations for precision and precedent cannot have been obscured. The plaintiff's motion fails to include any briefing, any citations to the record or any legal authority whatsoever. Rather, the plaintiff has simply filed a motion which simply asserts that Mr. Heiland is unqualified to render an opinion as to each of the five topics laid out in his report. While the motion states that it is supported by "the Transcript of Mr. Heiland's deposition and exhibits thereto," "Mr. Heiland's expert report,"

"the Affidavit of Deanna Weidner", "Excerpts from the Transcript of Danny Montgomery's deposition," as well as "Alpha's Brief in Support of Daubert Motion to Exclude Gregory Heiland's Expert Testimony," none of these documents have been provided to the Court, nor have they been filed on the docket nor served on opposing counsel. Given the lack of briefing and support, the Court will deny the plaintiff's motion as procedurally deficient under Local Rule 7.1(c).

## III. CONCLUSION

For the reasons discussed above, the Court will grant the defendant's motion to exclude the expert testimony of Mr. Louisos, will grant in part and deny in part the defendant's motion to exclude the expert testimony of Mr. Montgomery, and will grant in part and deny in part the defendant's motion to exclude the testimony of Mr. Beaton. In addition, the Court will deny the plaintiff's motion to exclude Mr. Heiland.

An appropriate order reflecting this will be forthcoming.

BY THE COURT:

　/s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE