# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **ALPHA PRO TECH, INC.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | **No. 12-1615** |
| **VWR INTERNATIONAL, LLC,** | : | |
| **Defendant.** | : | |

## MEMORANDUM

PRATTER, J.                                                          AUGUST 21, 2017

Alpha Pro Tech, Inc. ("APT") brings claims against VWR International, LLC ("VWR")

arising from VWR's sale of certain nonwoven, disposable laboratory apparel. While VWR had

carried APT's Critical Cover line of laboratory apparel products, it eventually transitioned to its

own private line of products, and APT takes issue with a variety of features of VWR's own line

of apparel. APT's claims for misappropriation of trade secrets under the Pennsylvania Uniform

Trade Secrets Act ("PUTSA") (Count I), unjust enrichment (Count III), and Lanham Act false

designation of origin and false advertising (Count V) survived an earlier motion to dismiss.

After years of acrimonious, often pointless, or, at best, puzzling, discovery, the parties

predictably filed a flurry of motions. That is their right. Currently before the Court are VWR

International, LLC's Motion for Summary Judgment (Docket No. 101), Alpha Pro Tech, Inc.'s

Motion for an Order (Docket No. 108), Alpha Pro Tech, Inc.'s Motion to Dismiss or In the

Alternative Motion for Summary Judgment (Docket No. 114), Alpha Pro Tech, Inc.'s Motion to

Dismiss (Docket No. 117),  Alpha Pro Tech, Inc.'s Motion to Dismiss (Docket No. 123), VWR

International, LLC's Motion to Strike (Docket No. 130),  VWR International, LLC's Motion for

Relief Under FRCP 56(e) (Docket No. 135), and VWR International, LLC's Motion for Relief Under the Court's February 3 and March 10, 2016 Orders (Docket No. 172).

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.    The Parties and the Industry

The parties in this lawsuit are suppliers and manufacturers of disposable protective laboratory apparel.[2] Disposable laboratory apparel is used in a variety of environments—ranging from life science laboratories to food service operations—that require clean room-type protection. The purpose of these products is to prevent particulates from the wearer's clothing from entering the laboratory environment. The disposable laboratory apparel at issue in this case includes above-the-knee garments (e.g. lab coats, aprons and frocks) and below-the-knee garments (e.g. shoe and boot covers) made out of non-woven polypropylene that is non-sterile. This apparel is typically used in controlled environments such as clean rooms.

VWR is a global laboratory supply and distribution company with customers in the life sciences, advanced materials, chemical, and manufacturing industries in North America and Europe. VWR offers branded products as well as VWR's private label line of products, which is typically more cost-effective. APT is a supplier of disposable protective apparel for use in scientific laboratories and medical settings. It sells its products through national distributors—including VWR—and regional distributors. At times, APT has derived the bulk of its revenue through sales facilitated by VWR.

---

[1] APT's response to VWR's Statement of Uncontested Facts ("SUF") does not include references to the record for a significant portion of its responses. Accordingly, where a fact has not been explicitly contested by APT with a citation to evidence in the record showing a genuine dispute, in keeping with the Court's published procedural requirements for summary judgment motions, the Court accepts it as undisputed.

[2] In addition to the corporate parties, Counterclaim Defendant Christopher Louisos is APT's Senior Vice President of Sales and Marketing.

2

## B. The Critical Cover Line

The APT Critical Cover branded products[3] at issue in this case were manufactured with spun bond polypropylene ("SBP") fabric. The manufacturing technique used APT's proprietary coated SBP method, which involved applying a coating to the spun bond polypropylene in order to enhance fabric characteristics like strength, durability, softness, breathability, and/or chemical and water resistance. APT initially used a lamination process, but moved to using an extrusion coating process. The extrusion coating process involves applying a coating of resins or polymers directly onto a substrate. Through experimentation, APT developed a combination of resins, polymers, and processes that aimed to mimic the performance specifications of its prior processes, which used laminate sourced for which an outside company was the source.

For a time, APT and VWR had an agreement that VWR would serve as APT's exclusive distributor of Critical Cover products and APT would make the bulk of its disposable apparel sales through VWR. Pursuant to the parties' agreement, VWR held the exclusive license to use the Critical Cover trademark and promotional literature, as well as the non-exclusive right to use other APT marks to describe subsets of products in the line. The agreement ended when VWR launched its own private label line.

## C. APT Outsources to China

APT began outsourcing its extrusion coating, cutting, and sewing components of its Critical Cover products to Xiantao Xinfa Plastics Company ("XXPC"), located in Xiantao, China, in the early 2000s. XXPC was owned and operated by Fu Lixin ("Mr. Fu"), who APT

---

[3] The Court is aware that CRITICAL COVER® is a registered trademark. For reading ease, however, the Court will refer to that product line as Critical Cover.

was connected with through a broker identified as Asian Pacific Partners.[4] XXPC is one of many factories that produced disposable laboratory apparel in the geographic area, and XXPC made laboratory apparel products for North American companies that competed with APT.

Initially, APT's relationship with Mr. Fu was limited to cutting and sewing products, but Mr. Fu's involvement eventually expanded. To facilitate production, APT installed an extrusion machine for Mr. Fu that was tailored to APT's process. At the outset of production, APT shipped its extrusion coating to Mr. Fu in unmarked containers—it did not disclose the identities of the resins. Mr. Fu would fulfill APT's orders at the factory, and an APT quality assurance team in China would inspect the products. Danny Montgomery—APT's Senior Vice President of Manufacturing—expressed some concerns about disclosing the process to Mr. Fu, but APT nonetheless shared the resins and recipe for the extrusion coating with him. APT alleged that Mr. Montgomery entered into an oral confidentiality agreement with Mr. Fu. After APT disclosed the ingredients and processes to Mr. Fu,[5] an APT employee in Mr. Fu's factory expressed concern that Mr. Fu was untrustworthy. The record does not contain an executed written confidentiality agreement between APT and Mr. Fu.

## D. VWR's Benchmarking Initiative and Renegotiation with APT

In the late 2000s, VWR began a benchmarking initiative aimed at comparing the prices of its private label categories (including some of the Critical Care products) with global market prices. As part of the initiative, VWR sent out requests for proposals to current suppliers to determine whether suppliers were providing costs to VWR that aligned with the market. Of

---

[4] The record contains what appears to be an unsigned confidentiality agreement between APT and Asian Pacific Partners, which generally states that Asian Pacific Partners would not solicit competitors. It also makes reference to an agreement by Mr. Fu not to sell or supply proprietary APT materials. *See* VWR Ex. 20.

[5] The instruction document given to Mr. Fu details the identity of the materials used for the coating, the blender and temperature settings, and the process for making the material for SureGrip, AquaTrack, and BarrierTech materials used in the UltraGrip shoe covers.

relevance here, VWR sought bids from suppliers in China to use as comparators with the garments APT supplied to VWR. During the process, XXPC and/or Mr. Fu supplied a quote and was selected.

As part of that process, Mr. Fu told VWR that he made the Critical Cover garments. When Mr. Fu submitted his initial quote, he represented that he was not in violation of any other agreement. When Mr. Fu and VWR were negotiating the terms of their contract, VWR asked for confirmation that XXPC would not be violating an agreement with APT by making the same products for VWR. In the agreement executed on June 29, 2009 between VWR and Mr. Fu, Mr. Fu again represented that he was authorized to enter into the agreement and that in doing so, he was not in violation of the law or other agreement.

Following the benchmarking process, VWR requested a price reduction from APT in order to continue with its 2006 private label agreement, which required annual renewal. In light of the quotes below APT's offered prices, VWR requested that APT offer a proposal to address the disparity. APT offered an 11% price reduction. VWR replied that it required a 45% price reduction to continue negotiations. After APT declined to further lower its prices, VWR notified APT that it would not renew the 2006 private label agreement which would then expire at the end of 2009.

## E. APT Responds to VWR's Agreement with XXPC

APT learned of VWR's agreement with XXPC immediately after VWR signed the agreement with Mr. Fu. APT expressed some initial surprise that VWR had taken so long to establish a direct relationship overseas, and it did not take any immediate action. Instead, APT employees observed VWR employees at Mr. Fu's factory, obtained samples of VWR's products,

and ran tests on those samples. It strictly monitored the resins it sent to Mr. Fu and concluded that Mr. Fu did not use APT's materials to produce VWR's products.

In addition to the monitoring, APT developed an initiative called "Project Cloverleaf" in response to VWR's contract with Mr Fu. Project Cloverleaf involved APT working with Fisher to sell Critical Cover products. Fisher, a VWR competitor, already sold APT products under the "Essential Solutions" brand, but Project Cloverleaf involved expanding Fisher's distribution to include Critical Cover products.

### F.    VWR Launches its Private Label Line

In March 2010, VWR launched its private label line of protection apparel branded Basic, Advanced, and Maximum Protection. The marketing materials for VWR's new private label line explained that it was transitioning from the Critical Cover line to its new line and explained that VWR "ha[d] not changed the manufacturer, manufacturing location, or the manufacturing process for 95% of the products in [the] new line. For the majority of the portfolio, only the brand name and part numbers w[ould] change." VWR Ex. 6. It stated that it would continue to make available the previous Critical Cover line for a minimum of 30 days during the transition. It also certified that certain of the new private label products did not experience a change in raw materials from the Critical Cover line. In the transition materials, VWR referred to an array of APT marks as points of comparison for VWR's new Basic, Advanced, and Maximum protection lines. The promotional literature contained a chart comparing VWR's new product line to the VWR Critical Care products that it had previously sold, particular product specifications, and drawings.

During the launch, some customers were concerned that the VWR Advanced and Maximum Protection shoe covers appeared to be flaking more than the Critical Cover shoe

6

covers did. Mr. Fu was, in fact, unaware of certain ingredients and variables used in making APT's products. After adjusting the formula or process, Mr. Fu produced a second generation of shoe covers that addressed the issues VWR customers were experiencing with the first generation. Independent test center established that the performance specifications of VWR's new line were superior to APT's specifications in some respects and used a different combination of resins than APT had used. VWR issued a correction letter advising end users to conduct their own testing, as it could no longer verify that the raw materials it used were exact.

After VWR's launch, APT sent VWR a letter accusing VWR of unethical business practices and theft of confidential information. APT issued a series of communications, which included a formal letter to VWR that it would no longer supply SureGrip and AquaTrak shoe covers, and a press release and letter to end users and distributors announcing that VWR was not the exclusive distributor of Critical Care products and the shoe covers were no longer available through VWR. Instead, APT expressed that it would be making its own Critical Cover products under its own brand and reached out to customers directly to pitch Critical Cover products. The letter to customers recognized that VWR had made the decision to convert products away from those APT had provided, *i.e.*, Critical Cover, to their imported brand of apparel.

APT ended its relationship with Mr. Fu in November 2010, at which point Mr. Fu returned APT's materials. The inventory agreement as to the return of the materials contained confidentiality language that prohibited APT and Mr. Fu from revealing confidential information.

### G. This Litigation

APT sued VWR in March 2012. In its Second Amended Complaint, filed on December 14, 2012, APT brought claims under five counts: VWR's alleged willful misappropriation of

trade secrets under PUTSA (Count I); breach of the APT–VWR contract—in particular, its confidentiality provision (Count II); VWR's unjust enrichment in retaining the benefit of APT's coated SBP method (Count III); for VWR's tortious interference with APT's oral contract with XXPC (Count IV); and false designation of origin and false advertising under the Lanham Act for VWR's statements promoting its new product line (Count V).

VWR moved to dismiss each count. The Court granted the motion with respect to Counts II and IV (breach of contract and tortious interference with contract) and denied it with respect to Counts I, III, and V (misappropriation of trade secrets; unjust enrichment; and Lanham Act false designation of origin and false advertising). VWR has now moved for summary judgment on the remaining claims (Counts I, III, and V).

In August 2015, VWR sought leave to file an amended answer with counterclaims, which the Court granted. VWR filed an amended answer in September 2015, which brought counterclaims against APT and Christopher Louisos, APT's Senior Vice President of Sales and Marketing. The counterclaim complaint contained six claims: Misappropriation of Proprietary and Confidential Information against APT and Mr. Louisos (Count I); Misappropriation of Trade Secrets under PUTSA against APT and Mr. Louisos (Count II); Unfair Competition against APT and Mr. Louisos (Count III); Civil Conspiracy against APT and Mr. Louisos (Count IV); Aiding and Abetting Breach of Fiduciary Duty against Mr. Louisos (Count V); and Interference with Prospective Economic Advantage against APT (Count VI).

In response, the Counterclaim Defendants (APT and Mr. Louisos) filed repeated iterations of motions seeking to dismiss the counterclaims. Eventually, the Court converted the motions to motions for summary judgment in light of their reliance on record evidence.[6]

## II.  STANDARD OF REVIEW

Upon motion of a party, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a summary judgment motion, the court "must view the facts in the light most favorable to the non-moving party" and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden may be met by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. Summary judgment is proper if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of

---

[6] While Counterclaim Defendants' challenge to the counterclaims was originally styled as a motion to dismiss, the Court converted it to a motion for summary judgment on February 3, 2016. (Docket No. 162). The other pending motions seek miscellaneous relief and are tethered to the various dispositive motions.

9

an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

## III.   DISCUSSION

Numerous motions are currently before the Court, but they essentially stem from two dispositive motions: VWR's motion for summary judgment on the counts that survived the motion to dismiss stage and the Counterclaim Defendants' motions for summary judgment as to the counterclaims.[7] The Court will address each in turn.

### A.    VWR's Motion for Summary Judgment

VWR's motion for summary judgment challenges each of APT's three remaining claims. First, it asserts that APT is unable to put forward evidence showing that it possessed a protected trade secret. Second, it asserts that APT's Lanham Act claims fail as a matter of law. Finally, it argues that APT has failed support its unjust enrichment claim with sufficient evidence. Reading the record in the light most favorable to APT, the Court agrees with VWR that APT has not shown a genuine dispute of material fact that would enable a reasonable jury to return a verdict in APT's favor. Therefore, the Court will grant summary judgment for VWR on the remaining claims in APT's Second Amended Complaint.

### 1.    Misappropriation of Trade Secrets in Violation of the Pennsylvania Uniform Trade Secrets Act (Count I)

APT claims that VWR violated the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 Pa. Const. Stat. Ann. §§5301-5308, by willfully misappropriating APT's trade secrets. In order to prevail on a misappropriation of trade secrets claim, a plaintiff must show not only that (1) the defendant possessed a trade secret, but also (2) that the defendant misappropriated that

---

[7] APT's response to VWR's motion for summary judgment, in addition to responding to VWR's arguments, appears to outline its own motion for summary judgment as to some of its remaining claims. Because the Court determines that APT has not put forth enough evidence to survive VWR's motion for summary judgment, it is certainly not entitled to summary judgment in its favor.

trade secret. *See Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109–10 (3d Cir. 2010);

*Moore v. Kulicke & Soffa Indus., Inc.*, 318 F.3d 561, 566 (3d Cir. 2003) (reciting the elements of

misappropriation of trade secrets in Pennsylvania as "(1) the existence of a trade secret; (2)

communication of the trade secret pursuant to a confidential relationship; (3) use of the trade

secret, in violation of that confidence; and (4) harm to the plaintiff.").

"A trade secret is information kept under confidential and that has economic value

because it is not common knowledge." *CertainTeed Corp. v. BIPV, Inc.*, No. CV 16-57, 2017

WL 1549983, at *5 (E.D. Pa. May 1, 2017). Under the PUTSA, a trade secret consists of

> [i]nformation, including a formula, drawing, pattern, compilation including a
> customer list, program, device, method, technique or process that:
>
> (1) Derives independent economic value, actual or potential, from not being
> generally known to, and not being readily ascertainable by proper means by, other
> persons who can obtain economic value from its disclosure or use.
>
> (2) Is the subject of efforts that are reasonable under the circumstances to
> maintain its secrecy.

12 Pa. Const. Stat. § 5302. To determine a trade secret, courts consider factors including: (1) the

extent to which the information is known outside of the owner's business; (2) the extent to which

it is known by employees and others involved in the owner's business; (3) the extent of the

measures taken by the company to guard the secrecy of the information; (4) the value of the

information to the company and its competitors; (5) the amount of effort or money the company

spent in developing the information; and (6) the ease or difficulty with which the information

could be acquired or duplicated legitimately by others. *Bimbo Bakeries*, 613 F.3d at 109; *see

also Nova Chems., Inc. v. Sekisui Plastics Co., Ltd.*, 579 F.3d 319, 327 (3d Cir. 2009). It is

axiomatic that, to warrant legal protection, a trade secret must be, in fact, a secret. "Matters

which are fully disclosed by a marketed product" and that can be reverse engineered do not

qualify as trade secrets. *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1256 (3d Cir. 1985).

The question of whether an owner possesses a trade secret is a question of law, but determination of this legal issue requires establishing a number of factual predicates. *See Anaconda Co. v. Metric Tool & Die Co.*, 485 F. Supp. 410, 414 (E.D. Pa. 1980) *declined to follow on other grounds by, Santana Products, Inc. v. Bobrick Washroom Equipment*, 401 F.3d 123 (3d Cir. 2005). Therefore, it is generally for a jury to decide whether information amounts to a trade secret. *See Avanti Wind Sys., Inc. v. Shattell*, Civ. A. No. 14-98, 2016 WL 3211990, at *12 (W.D. Pa. June 9, 2016). Summary judgment is proper, however, when the Court is faced with uncontroverted facts showing that the movant is entitled to it. *CertainTeed Corp.*, 2017 WL 1549983, at *5. The Court is faced with just such a scenario here, where the uncontroverted facts demonstrate that the alleged trade secret could in fact be "reverse engineered."

Before the Court turns to the evidence of reverse engineering, it compelled to address the definition of trade secret at play in this case, or lack thereof. While this should be a relatively straight forward question, as in all aspects of the prosecution of this case, counsel has done their utmost to muddy the waters, deliberately or inadvertently. Even at this late stage of the proceedings, APT's counsel remains unable to provide a clear articulation of what constitutes the trade secret that supposedly has been compromised. What began as an initial definition rooted in the alleged proprietary mixture of two commercially available resins at specific blender settings to form an elastomer coating, has shifted, morphed, and expanded throughout this litigation, seemingly only in order to dodge the opponent's evidence and argument. When the Court posed direct questions at the hearing, counsel was unwilling to be pinned down:

THE COURT: I'm glad you used that two-word phrase trade secret. What is it that your client is saying is the trade secret?

MR. ANDERSON: You Honor, the trade secret –

THE COURT: Because, frankly, I've got to tell you, between these motions and the summary judgment motion and what we've been able to divine in terms of your client's position, there seems to be a little bit of a difference in terms of what's described as a trade secret depending upon what the issue is. So what's the trade secret? What are we fighting about?

MR. ANDERSON: Your Honor, the trade secret is what Mr. Montgomery developed and it consists of a secret blend of resins.

THE COURT: Is it the recipe or is it the process?

MR. ANDERSON: Both. You have to have both to make it work. You have to have everything. You have to have the equipment.

THE COURT: The equipment, the tolerances, the resins, the mixture, the quality control. And that's what you say are the trade secrets or one trade secret?

MR. ANDERSON: Actually, you have to put it together to make one trade secret, Your Honor.

THE COURT: Okay, it's one trade secret?

MR. ANDERSON: It is. It has several parts, but it's one trade secret. It's secret resins blended in a secret way used in specially-modified equipment. The settings on the equipment, the temperatures, tolerances, everything, if they're not right, it doesn't work. And nobody had been able to do that as of 2009. We had the only product on the market that had those qualities.

February 2, 2016 Hr. Tr. at 28–29. The Court includes this lengthy colloquy to show the manner in which the purported trade secret seems to have evolved—even over the course of just several questions from the Court—from the resins, to the resins and the recipe, to the resins the recipe and the equipment, to essentially everything even remotely related to the production of APT's shoe covers.[8]

---

[8] This characterization appears to be a rough approximation of APT's articulation of the trade secret included in their briefing in opposition to the VWR's motion for summary judgment. Not to belabor the point, however, but both of these articulations differ from the manner in which Mr. Montgomery—who is cited by APT's counsel in the colloquy with the Court as the source of the secret—characterized the alleged secret. Mr. Montgomery testified that the trade secret was the concept of "using an elastomer in a homopolymer polypropylene" on a spun bound polypropylene fabric. July 9, 2015 Montgomery Dep. at 80–81. He later testified more generally that "by using an elastomer" in its competing products, VWR was misappropriating APT's trade secret. Sept 3, 2015 Montgomery Dep at 61.

VWR's briefing attacks two iterations of APT's alleged trade secret: the recipe showing the allegedly proprietary mixture of resins and the general concept of using an elastomer coat disposable shoe covers.[9] It appears that the holistic definition of trade secret advanced by APT lies somewhere in between the two, but VWR's arguments are nonetheless applicable. The Court will take APT's counsel at his word and treat the holistic version—incorporating the full panoply of resins and recipes—as the disputed trade secret. While the definition here is elusive, trade secrets can indeed be broad in scope: "A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Camelot Tech., Inc. v. RadioShack Corp.*, No. 01 -4719, 2003 WL 403125, at *6 (E.D. Pa. Feb. 13, 2003) (citing Anaconda Co., 485 F. Supp. at 422). Accepting such a flexible definition of the trade secret only advances APT insofar as it can actually show that this panoply of products and processes actually satisfies the legal requirements of a trade secret, however. It cannot.

While VWR articulates a variety of arguments as to why APT cannot proceed with its trade secret claim, one is dispositive—that the alleged trade secret here can be "reverse

---

[9] With respect to the broad definition of trade secret—which seems to extend beyond even the lose bounds of APT's slippery definition provided at oral argument—VWR raises additional, but overlapping challenges. VWR urges that unquestionably broad concept of using an elastomer with a homopolymer polypropylene to coat disposable shoe covers is widely known in the industry and therefore cannot be considered a trade secret. It points to information disclosed in various patents (and is therefore publicly available) and other companies' shoe covers that incorporate elastomer blends. Where alleged secrets are commonly understood in an industry or are disclosed through public patent filings, they do not receive trade secret protection. *See, e.g., Midland-Ross Corp. v. Sunbeam Equip. Corp.*, 316 F. Supp. 171, 177–78 (W.D. Pa. 1970), *aff'd,* 435 F.2d 159 (3d Cir. 1970) (finding that "[t]he very act of publishing a trade secret in a patent destroys the secretive nature of that which is disclosed therein" and "[m]ethods of manufacture or design and details of construction which are matters of general scientific knowledge in the industry do not constitute trade secrets"). Furthermore, under 12 Pa. Const. Stat. Ann. § 5302, trade secrets cannot be comprised of something that is "readily ascertainable." *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 40 F. Supp. 3d 437, 452 (E.D. Pa. 2014) (holding that alleged trade secret information that was generally known in the industry and available through trade publications was readily ascertainable and therefore not entitled to trade secret protections). To the extent that APT seeks such sweeping protection—which, as the Court has already acknowledged, remains a mystery—it would certainly fail as a matter of law.

engineered." Reverse engineering involves "starting with the known product and working backward to divine the process which aided in its manufacture." *SI Handling Sys.*, 753 F.2d at 1255. In Pennsylvania, "[i]f a product can be reverse engineered, then the product is not entitled to trade secret protection." *CertainTeed Corp.*, 2017 WL 1549983, at \*6; *see also SI Handling Sys.*, 753 F.2d at 1262 ("[U]nder Pennsylvania law [the product line] is not entitled to trade secret protection if it is susceptible to reverse engineering, regardless of whether [defendants] in fact went through such an exercise."); *Camelot Tech., Inc.*, 2003 WL 403125, at \*6 ("The standard in Pennsylvania regarding reverse engineering is that there is no trade secret if, at the time of disclosure or use by a misappropriator, the allegedly secret information could have been ascertained by inspection of sold articles or by reverse engineering." (internal quotation marks omitted)); *Permagrain Prod., Inc. v. U. S. Mat & Rubber Co.*, 489 F. Supp. 108, 112 (E.D. Pa. 1980) ("[I]t is well-settled that where a product's secret can be determined through "reverse engineering," protection for the product cannot be claimed."). Because the record here demonstrates that the alleged trade secret at issue can be reverse engineered, VWR is entitled to summary judgment.

VWR's expert, Dr. Ganjanan Bhat, has opined that the laboratory apparel products at issue in this case are capable of being reverse engineered. *See* VWR Ex. 10, Bhat Report ¶¶ 47–54. In his expert report, he explained that he could run tests (such as the ones he ran in his report) to determine the products' physical, chemical, and molecular properties. Someone familiar with the nonwoven fabric industry could determine the approach taken to produce the products (extrusion coating), and, after some tinkering with the resin mixtures over time, reach the desired performance specifications. Dr. Bhat estimated that the process would take approximately two months.

15

APT nearly admits that the products here were reverse engineered. It acknowledges that Mr. Fu "did not know the exact amount of the elastic component in [APT's Basel] resin" and accordingly, ran tests "solving for the only remaining variable." This, VWR argues, is precisely what constitutes reverse engineering, and wholly undercuts APT's claim. Even if APT disputes that reverse engineering actually occurred in this case, APT's own expert testified that the products could be reverse engineered. This is sufficient to foreclose its claim. Mr. Montgomery testified that "the right person could probably reverse engineer." Montgomery Dep. at 214:14– 20. While he recognized that it might be difficult to do so, someone with "the tenacity and the will to do it . . . could probably, over time, be successful." Montgomery Dep. at 216:5–8. Thus, the dispute does not appear to be over whether the products here are capable of being reverse engineered (the operative question) but rather how long that reverse engineering process might take.

Therefore, the Court concludes that VWR is entitled to summary judgment on APT's trade secrets misappropriation claim. Because the Court concludes that that VWR's reverse engineering argument forecloses that possibility that APT possessed a protected trade secret, it will not address VWR's other arguments. The Court will grant summary judgment for VWR on Count I.

## 2. Lanham Act False Designation of Origin and False Advertising (Count V)

APT also brings two claims under the Lanham Act for false designation of origin and false advertising. Section 43(a) of the Lanham Act, codified at 11 U.S.C. § 1125(a), provides, in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device,

or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Because the Court concludes that APT has not put forth sufficient evidence supporting either of its two Lanham Act claims under Section 1125, it will grant summary judgment for VWR on Count V.

### a. False designation of origin

While APT's position is muddled, it essentially contends that VWR's representations caused customers to believe that VWR's new product line was comprised of Critical Cover products under a different brand name, thereby falsely representing the origin of VWR's new product line. The elements of a false designation of origin claim are:

(1) that the defendant uses a false designation of origin; (2) that such use of a false designation of origin occurs in interstate commerce in connection with goods or services; (3) that such false designation is likely to cause confusion, mistake or deception as to the origin, sponsorship or approval of the plaintiff's goods and services by another person; and (4) that the plaintiff has been or is likely to be damaged.

*Parker v. Google, Inc.*, 242 F. App'x 833, 838 (3d Cir. 2007) (citing *AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1428 (3d Cir. 1994)). As the Court previously noted, the Third Circuit Court of Appeals recognizes these "passing off" or "palming off" claims as violating Section 1125(a) even when the customers recognize the "passing off" before transacting business with the defendant engaging in the objectionable conduct. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 294-95 (3d Cir. 2001). This particular

type of passing off, which creates what is known as "initial interest confusion," is prohibited by the Lanham Act because without such protection, "an infringer could use an established mark to create confusion as to a product's source thereby receiving a 'free ride on the goodwill' of the established mark." *Id.* The Court previously recognized that the Court of Appeals has embraced a flexible approach to the bounds of standard "passing off" cases and applies a test geared toward the factual situation of a given case. *See Winback*, 42 F.3d at 1428 n.9. The Court previously concluded that Section 43(a) of the Lanham Act is properly interpreted to reach the type of conduct APT alleges because otherwise a defendant could escape liability for passing off simply by using another's mark—a false designation of origin—to establish the equivalency of the other's mark and the defendant's new mark, and then shift to using only its new mark. The defendant would be doing indirectly what section 43(a) clearly prohibits it from doing directly.

Notably, the test for false designation of origin is not "actual confusion," but rather "likelihood of confusion." *Winback*, 42 F.3d at 1442–44. The Court allowed the false designation of origin claim to survive the motion to dismiss in large part because it declined to wade into the likelihood of confusion inquiry at that procedural juncture. Relying upon to VWR's comparison statements between VWR and APT's products during the transition, the Court declined to dismiss this claim, concluding that it could not determine whether such comparison statements were likely to confuse. At the summary judgment stage, however, the Court is now called upon to do so. The Court does not have much more beyond those comparison statements in the record before it now and therefore concludes that APT, even knowing well in advance of the Court's likely focus, has failed to put forth enough evidence supporting likelihood of confusion to permit this claim to proceed. Accordingly, VWR is entitled to summary judgment on APT's false designation of origin claim.

The basis of APT's claim principally centers upon the representations VWR made during the time that it was transitioning away from the Critical Cover line to its new private label line. APT primarily alleges, on the basis of a variety of VWR communications, that VWR falsely represented the origin of its products when it told its customers that it was transitioning away from its Critical Cover to those associated with its new line, that the APT products were discontinued and replaced with the new line, and that the new line would have the same product offerings.

VWR raises two major challenges to APT's false designation of origin claim: (1) APT's claim is barred by the Supreme Court's decision in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 (2003), and (2) APT has failed to put forth evidence of a likelihood of confusion. The Court declines to adopt VWR's argument that *Dastar* forecloses APT's claims,[10] so it will focus its attention on VWR's challenge that APT has failed to show likelihood of confusion.

---

[10] VWR argues that APT cannot maintain its false designation of origin claim in light of *Dastar*, a "reverse" passing off case where the Supreme Court was called upon to interpret the meaning of "origin" and "goods" in Section 1125(a). There, the Court concluded that the phrase "origin of goods" refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods. *Dastar*, 539 U.S. at 37. Relying upon this cabined definition of "origin" VWR argues that APT's claim cannot proceed because, at bottom, it is "a complaint that Mr. Fu unfairly employed Alpha's ideas in making equivalent products for VWR (and potentially many other of his customers)," not about actual, tangible origin of the product. VWR Br. 46. VWR argues that *Dastar* forecloses recovery.

APT maintains that it is bringing a passing off case, not a reverse passing off case, thereby distinguishing it from *Dastar*. There is a material difference between passing off and reverse passing off claims. *Kehoe Component Sales Inc. v. Best Lighting Prod., Inc.*, 796 F.3d 576, 586 (6th Cir. 2015), *reh'g denied* (Sept. 14, 2015) (explaining the difference between passing off and reverse passing off cases). When this Court allowed the false designation of origin claim to proceed past the motion to dismiss stage, the Court understood it as a passing off claim, not a reverse passing off claim. It recognized that, given the Third Circuit Court of Appeals' guidance to employ a flexible test "geared to the factual situation of this case," *AT&T Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1428 n.9 (3d Cir. 1994), APT's factual allegations, if proven true, would make out a claim for false designation of origin/implied passing off because VWR's marketing materials would confuse consumers as to whether VWR's new products were simply APT's Critical Cover products by another name, and therefore products that were passed off as, but not in fact, Critical Cover products.

Regardless of whether a reverse passing off claim is appropriate here, that is not what APT has been arguing or how the Court has interpreted APT's arguments up to this point. Accordingly, in the absence of authority requiring it to do so, the Court declines find that *Dastar* ends the inquiry in this case and will not delve into analysis of the "origin," as required by *Dastar*.

19

VWR argues that APT has not shown likelihood of confusion, which is the third element

of a false designation of origin claim under the Lanham Act. To determine the likelihood of

confusion, the factfinder must consider, among other factors, those commonly referred to as the

*Lapp* factors. They include:

> (1) [The] degree of similarity between the owner's mark and the alleged
> infringing mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention
> expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of
> actual confusion;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, though not competing, are marketed through the same
> channels of trade and advertised through the same media;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of consumers because of the
> similarity of functions; and
> (10) other facts suggesting that the consuming public might expect the prior
> owner to manufacture a product in the defendant's market or that he is likely to
> expand into that market.

*Checkpoint Sys., Inc.*, 269 F.3d at 280 (alteration in original). None of the *Lapp* factors is

determinative in the likelihood of confusion analysis and each factor must be weighed and

balanced one against the other. *Id.* Moreover, the likelihood of confusion inquiry is a qualitative

one so "[n]ot all factors will be relevant in all cases," and their respective weights may differ in

different factual settings. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198,

215 (3d Cir. 2000). Accordingly, "[a] district court should utilize the factors that seem

appropriate to a given situation." *Id.*; *see also Century 21 Real Estate Corp. v. Lendingtree, Inc.*,

425 F.3d 211, 224 (3d Cir. 2005) (recognizing, in the context of nominative fair use, that certain

of the *Lapp* factors are unworkable or not helpful indicators of confusion and requiring that the

test be tailored to measure only those factors that are meaningful and probative in the context).

Here, VWR argues that APT has fallen short of its obligation to show likelihood of

confusion and therefore cannot proceed with its false designation of origin claim. The parties, in

many ways, talk past one another on the issue of likelihood of confusion, but Court interprets the

briefing to, align with some, but not all, of the *Lapp* factors: (1) the price of the goods and other

factors indicative of the care and attention expected of consumers when making a purchase; (2)

the length of time the defendant has used the mark without evidence of actual confusion; (3) the

intent of the defendant in adopting the mark; and (4) the evidence of actual confusion. *See*

*Century 21 Real Estate Corp.*, 425 F.3d at 226. The Court will address each in turn.[11]

First, the Court concludes that the customer care and attention factor casts great doubt on

any likelihood of confusion. The Court of Appeals in *Checkpoint Sys., Inc.* explained that

"[w]hen consumers exercise heightened care in evaluating the relevant products before making

purchasing decisions, courts have found there is not a strong likelihood of confusion" and when

the customer "class consists of sophisticated or professional purchasers, courts have generally

not found Lanham Act violations." 269 F.3d at 284. Where, as in this case, the "relevant buyer

class is composed of professionals or commercial buyers familiar with the field, they are

sophisticated enough not to be confused." *Id.* (quoting 3 McCarthy on Trademarks, § 23:101).

Included among the buyers APT claims were confused in this case are Bristol-Myers Squibb,

Teva Pharmaceuticals, Shire, Metronic, Intel, 3M, Genenetech, and Nestle. Such purchasers are

large, sophisticated customers who typically engage in validating procedures, particularly

---

[11] APT had sought to have Mr. Louisos testify that VWR's actions caused consumer confusion under the *Lapp* factors. The Court rejected this line of testimony wholesale in its *Daubert* opinion, concluding that "Mr. Louisos may have had conversations with Alpha customers, i.e., hearsay, who expressed 'confusion' as to the difference between Alpha and VWR marks, but there is no basis in the record to allow for the conclusion that Mr. Louisos has any expertise or specialized knowledge necessary to extrapolate from these anecdotal hearsay conversations an assessment of consumer confusion generally." *Daubert* Op. 8. Moreover, the Court determined that it would be improper to allow Mr. Louisos to testify regarding the applicability of the *Lapp* factors because such testimony "would constitute an opinion that these factors are controlling on the jury's analysis. It is the duty of the Court, not a witness, to tell the jury what law should be applied. This proposed feature for [testimony by] Mr. Louisos is a blatant effort to usurp the Court's role." *Daubert* Op. 8.

following a change in part number. The laboratory apparel at issue in this case is typically used in non-sterile clean room/controlled environments, where customers' validating procedures tend to be thorough. No party disputes this.

Mr. Louisos characterized customers in this case as acting like "Judge Judy," where, upon receiving information from VWR and APT, they would draw their own comparisons of the lines and come to their own conclusions. *See* July 1, 2015 Louisos Dep. 45:3-47:1. APT has not put forth any evidence that customers here were unsophisticated or did not in fact exercise heightened care.[12] Accordingly, the Court concludes that this *Lapp* factor weighs in favor of VWR.

Second, the Court concludes that the evidence of actual confusion and the length of time the mark was used without actual confusion weigh in favor of finding no likelihood of confusion. Evidence of actual confusion is not required to prove likelihood of confusion, but because actual confusion may go unreported, such evidence may be highly probative of the likelihood of confusion. *Checkpoint Sys., Inc.*, 269 F.3d at 291. By the same token, "[i]f a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to consumer confusion in the future." *Checkpoint Sys., Inc.*, 269 F.3d at 291.

VWR argues that there is scant evidence of actual confusion in the record, and the alleged actual confusion that APT points to is insufficient or not actionable. Mr. Louisos at APT identified six customers who were allegedly confused during the transition: Bristol-Myers Squibb, Teva Pharmaceuticals, Shire, Metronic, Intel, and Warner Chilcott. Bristol-Myers

---

[12] APT points to Intel's alleged confusion as an example. Intel apparently did not engage in a thorough vetting process when it purchased VWR's new line and expressed concerns when the first generation did not perform according to its expectations. The Court declines to, on the basis of this singular example, make conclusions about the likelihood of confusion among the consumer base generally.

Squibb , Teva, Shire, and Metronic each appeared to have engaged in conversation with APT about the transition, asking APT for further explanation of the differences between VWR's new product line and the Critical Cover products. Their "confusion" (if such questions can even be fairly characterized as "confusion" rather than simply prudent inquiry), however, does not appear to be based in the notion that they believed they were actually purchasing APT products from VWR, rather, that they were confused about whether a VWR-produced product they purchased was equivalent to APT's Critical Cover products. APT retained business with at least some of these companies.

It its papers responding to VWR's motion, APT also identifies 3M, Jackson Labs, Genenetech, Nestle, Pharmaceutical International, L3, Micron Manassas, and Axenia Biologix, Cook Pharmica, Edward Life Sciences, and Amgen as companies that experienced confusion, but the communications that APT points to either do not relate to confusion at all, or in fact demonstrate that the customer knew that the new VWR product differed from APT's Critical Cover product. For example, APT relies upon communications from Intel, 3M, and Pharmaceutical International noting the problems with VWR's first shoe generation of shoe covers. While the communications might support that the customers believed they were receiving an equivalent product that would perform in the same manner as APT's products, they do not support the conclusion that the customers thought they were *actually* buying APT products. Indeed, they readily identified the first generations initial shortcomings. Likewise, Jackson Labs unequivocally recognized that it purchased a VWR product, but simply expressed disappointment that it did not perform similarly to APT's product. Finally, APT points to an email where Nestle, upon receiving a pitch from VWR extolling the benefits of its new line of products and the ways in which it was superior to APT's, chose to retain its relationship with

APT. Construing these communications in the manner most favorable to APT, they do not demonstrate that customers were actually confused by the transition or believed they were purchasing APT-produced products. Furthermore, the record demonstrates that when APT found out about VWR's new line, it contacted its customer base and informed them both that it was still selling Critical Cover products and that it was no longer supplying them to VWR, thereby distinguishing Critical Cover from VWR's new product line. To the extent that any confusion existed, the Court concludes that it was *de minimis* and not sufficient to show likelihood of confusion. Accordingly, the Court determines that the *Lapp* factors pertaining to actual evidence weigh in favor of concluding there was no likelihood of confusion.

Finally, the Court concludes that considerations of VWR's intent also weigh in favor of finding no likelihood of confusion. "[C]ourts have recognized that evidence of 'intentional, willful and admitted adoption of a mark closely similar to the existing marks' weighs strongly in favor of finding the likelihood of confusion." *Checkpoint Sys., Inc.*, 269 F.3d at 286 (quoting *National Football League Props., Inc. v. New Jersey Giants, Inc.*, 637 F. Supp. 507, 518 (D.N.J. 1986)). APT's intent argument is based upon statements VWR made about how it could be easier to proceed through certification and testing procedures if it represented that was the same product that APT produced—which differs from VWR willfully and outwardly adopting a similar mark. This is not a case where VWR "adopted" similar marks to APT at all. In its transition materials, VWR compared its products to APT's products. The names of VWR's new Basic, Advanced, and Maximum protection lines differed from APT's lines and there is no evidence that VWR adopted a mark resembling APT's marks.

The Court concludes that here, the *Lapp* factors weigh in favor of VWR and APT has failed to meet its burden of showing likelihood of confusion. Accordingly, the Court need not

address VWR's affirmative defense of nominal fair use,[13] and the Court will grant summary judgment on behalf of VWR.

## b.  False advertising

APT also contends that VWR made literally false statements in advertising its new product line, in violation of the Lanham Act.  The false advertising claim centers on communications VWR made during its transition to its private label line, particularly a certification letter.  APT claims that VWR's advertising caused customers to believe that VWR's products were Critical Cover products under a different brand name (because they had the same components and processes) when, in fact, they were different products.

To prevail on a false advertising claim, a plaintiff must prove that (1) the defendant has made false or misleading statements about its own product or the plaintiff's; (2) "there is actual deception or at least a tendency to deceive a substantial portion of the intended audience"; (3) "the deception is material in that it is likely to influence purchasing decisions"; (4) "the advertised goods traveled in interstate commerce"; and (5) "there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011) (citations omitted).

The second prong's "actual deception" requirement does not require that the advertisement be "literally false." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002).  There are two types of false advertising claims (1) a literally false advertising statement or (2) an advertising statement that is

---

[13] APT points out that VWR had held a license permitting it to use APT's trademarks to sell APT's products, but that the license did not extend beyond APT's products and was terminated by the time VWR was making the representations APT alleges comprised false designation of origin.  APT argues that VWR's expired prior license to APT's marks aided in deceiving customers into thinking that VWR's products originated as APT's Critical Cover products.  VWR argues that its use of the Alpha Critical Cover trademark was "fair use" and VWR simply invoked the Critical Cover label in order to compare its new private label products to the previous APT products it carried, which is a permitted form of comparative advertising.

"literally true or ambiguous, but has the tendency to deceive consumers." *Id.* If the plaintiff can show the literal falsity of the message, he earns a presumption of actual deception and can therefore satisfy the second prong more easily. *Pernod Ricard*, 653 F.3d at 248.

If "the message conveyed by an advertisement is literally true or ambiguous, however, the plaintiff must prove actual deception or a tendency to deceive." *Id.* Because the concern is "the message that is conveyed to consumers," to fall under the statute's coverage of deceptive statements, a message that is not literally false must be proved to have misled the public by showing actual confusion on the part of consumers: "Public reaction is the measure of a commercial's impact." *Johnson & Johnson–Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129-30 (3d Cir. 1994); *accord Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 171 (3d Cir. 2001) ("If a claim is literally true, a plaintiff cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react." (citation and internal quotation marks omitted)). "If the advertisement is literally true, the plaintiff must persuade the court that the persons to whom the advertisement is addressed would find that the message received left a false impression about the product." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir. 1990) (citation and internal quotation marks omitted).

VWR argues that APT has failed to satisfy the *prima facie* case for false advertising. It primarily argues that (1) VWR's statements relating to the transition are not false or misleading, (2) the alleged false statements did not deceive consumers or have the tendency to deceive, (3) the alleged false statements were not material to the end user's purchasing decision, and (4) APT has put forth no evidence that the alleged false advertising cause APT's injuries.

In its response APT, digs in its heels on the position that the allegedly false statements at issue in this case are not merely misleading but are "literally false," and are therefore entitled to presumptions of actual deception and materiality. *See Pernod Ricard*, 653 F.3d at 248; *Ecore Int'l, Inc. v. Downey*, No. CIV.A. 12-2729, 2015 WL 127316, at \*4 (E.D. Pa. Jan. 7, 2015) ("The presumption appears to cover materiality as well."). Assuming, it seems, that the Court would be applying the presumptions at APT's bidding, it did not brief the deception and materiality prongs extensively. Instead, in its briefing and at oral argument, it maintained that various presumptions applied that lowered APT's burden. *See* APT Br. 68 (observing that APT does not need to show that customers were actually deceived and instead focusing on the question of literal falsity); APT Br. 105 ("Like the actual deception prong, Alpha is not required to come forward with evidence of materiality."); February 2, 2016 Hr. Tr. at 88–99 (Ms. WEIDNER: "Well, when there's literal falsity . . . there's a presumption of causation").[14]

APT fails to recognize, however, that the presumptions it seeks to invoke are inapplicable to cases where the plaintiff only seeks monetary damages. *See Ecore Int'l, Inc.*, 2015 WL 127316, at \*4 ("[I]n the Third Circuit, this presumption [of deception and materiality] is only effective when [the plaintiff is] seeking injunctive relief rather than damages."); *Syncsort Inc. v. Innovative Routines Int'l, Inc.*, No. CIVA 04-3623 (WHW), 2008 WL 1925304, at \*11 (D.N.J. Apr. 30, 2008) ("Instead of even attempting to point to evidence that customers were actually deceived or relied on the advertising statement, [the plaintiff] argues that Third Circuit law does not require it to show actual reliance if the statements were literally false. [The plaintiff] confuses what is required of a plaintiff who seeks injunctive relief and what is required of a

---

[14] To be sure, APT showed some understanding that it may indeed need to put forth additional evidence to support likelihood of confusion, however. Ms. Weidner suggested that APT would overcome hearsay problems in the scant evidence pointing to customer confusion in the record "in the same way that a survey gets over the hearsay problem," by "bring[ing] people in." While counsel's "solution" may be in error, the recognition of the problem is apt.

27

plaintiff who seeks damages."). It is undisputed that APT seeks only money damages. *See* APT's Resp. to SUF ¶ 143 ("Alpha admits that it has only sought monetary damages in this case"). Accordingly, the presumptions upon which APT relies are inapplicable.

The Court need not determine whether a reasonable jury could conclude that the allegedly false advertising at issue here was "literally false." Regardless of whether some of the statements in VWR's advertising satisfied the first prong by being literally false or simply misleading, APT has failed to put forth enough evidence to satisfy the rest of the *prima facie* case as it is required to do. The plaintiff in *Ecore Int'l, Inc. v. Downey* took a similar approach to APT here and argued that the second element, actual deception or a tendency to deceive, and the third, materiality of the deception, may be presumed in cases where the representations at issue are literally false rather than simply misleading. The *Ecore Int'l* Court determined that indeed, "the statements in this case appear to be literally false and thus certainly misleading under the first element of the claim," but declined to apply the presumptions the plaintiffs sought. *Ecore Int'l, Inc.*, 2015 WL 127316, at \*5. But the *Ecore Int'l* court concluded that "Plaintiff's reliance on the literal falsity of the misrepresentations is insufficient to conclude as a matter of law that it has made its case on all the necessary elements of a false advertising claim." *Id.* Further, the court determined that the plaintiff's "off-hand" reference "that two actual customers were misled" was simply "a bare statement [that] cannot establish a crucial legal element." *Id.*

There is some evidence on the record here that some of VWR's statements may have been "literally false," but that does not end the inquiry. APT must show, among other things, (1) actual deception or a tendency to deceive and (2) materiality. These requirements are not easily satisfied. *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129–30 (3d Cir. 1994) (noting that the "factfinder must determine whether the

public was, in fact, misled" and that "the success of the claim usually turns on the persuasiveness of a consumer survey"). APT has not pointed to any non-hearsay customer testimony on the record that the allegedly false statements misled customers or influenced their purchasing decisions, and it rejects the need for a survey. The evidence APT has pointed to appears to be bare statements pertaining to a handful of customers that, as in *Ecore Int'l*, cannot establish a crucial legal element. Moreover, the record shows that APT had informed all of its customers that it and VWR were offering different products. At best, there are discrete and somewhat speculative instances of customers being misled, but as in *Ecore Int'l, Inc.*, the Court declines to find that these "bare statements" satisfy the second or third prongs required to show false advertising.

### c. Conclusion

Because the Court determines that APT has failed to put forth sufficient evidence supporting its false designation of origin and false advertising claims under the Lanham Act, the Court will grant summary judgment for VWR on Count V.

### 3. Unjust Enrichment

VWR also argues that the Court should grant summary judgment in its favor on APT's unjust enrichment claim. Pennsylvania law on unjust enrichment requires that a plaintiff show "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999). At bottom, unjust enrichment is an equitable remedy. *See Styer v. Hugo*, 619 A.2d 347, 350 (1993), *aff'd,* 637 A.2d 276 (1994); *see also Century*

*Indem. Co. v. URS Corp.*, No. CIV.A. 08-5006, 2009 WL 2446990, at *6 (E.D. Pa. Aug. 7, 2009) (observing that courts focus on whether the defendant was enriched *unjustly*).

In its opinion denying VWR's motion to dismiss the unjust enrichment claim, the Court observed that the viability of the unjust enrichment claim turns on the outcome of APT's trade secrets claim. The Court contemplated that "[h]owever unlikely the case may be, if APT fails to prove that its coated SBP method constituted a trade secret but nonetheless proves that it was a benefit conferred by XXPC upon VWR, which unjustly retain it, APT should be able to pursue an unjust enrichment claim." Opinion on Mot. to Dismiss, at 31. Essentially, the Court previously concluded that APT could proceed with its unjust enrichment claim should the Court find that the information from APT did not constitute a trade secret but that nonetheless, VWR retained it to its own benefit and APT's detriment. Some courts, however, have granted summary judgment to a defendant on an unjust enrichment claim that was "derivative" of a trade secret claim where the court granted summary judgment. *See, e.g., Sweet St. Desserts, Inc. v. Better Bakery, LLC*, No. CIV.A. 12-6115, 2015 WL 4486702, at *10 (E.D. Pa. July 23, 2015).

For the reasons explored above, the Court concludes that APT has not put forth evidence establishing that the information at issue here was a trade secret. It has likewise not been presented with sufficient evidence that paves the alternate route to recovery it outlined at the motion to dismiss stage. In fact, VWR points to evidence in the record that its shoe covers used a different resin formula and therefore urges that no trade secret had been adopted. In other words, no evidence in the record establishes that VWR actually used any benefit it allegedly obtained. *See* SUF ¶¶ 106, 138; VWR Ex. 10, Bhat Report ¶ 27.

APT devotes a cursory two paragraphs—containing no citation to any evidence on the record—to assert that its unjust enrichment claim should proceed past summary judgment.

Setting aside the fact that APT seems to now assert an unjust enrichment claim rooted in use of APT's mark as opposed to its alleged trade secret, the Court concludes that it cannot proceed with either theory on the record before it. Indeed, APT has not pointed to any evidence on the record demonstrating that VWR was conferred benefits, it appreciated them, and retained them in an unjust manner that permits exercise of an equitable remedy. Therefore, the Court will grant summary judgment for VWR on APT's unjust enrichment claim (Count III).

## B. APT and Mr. Louisos's Motion for Summary Judgment

The Counterclaim Defendants' efforts to challenge the claims against them have been wholly untimely and plagued with deficiencies. On September 23, 2015, VWR filed is amended answer, which included counterclaims against APT and Christopher Mr. Louisos. Docket No. 110. On October 13, 2015, Alpha filed a two-page motion to dismiss. *See* Docket No 114. The motion stated that an accompanying brief and authority would be filed under seal, but no such documents appear to have been filed or served at that time. *See* Docket No. 130 (VWR noting that no sealed documents in support of motion were ever served on VWR, despite a certificate of service being filed with APT's motion). Counsel for VWR requested the briefing via email, but APT never responded.

On October 26, 2015—the date on which Mr. Louisos was required to reply to VWR's counterclaims—APT and Mr. Louisos filed a joint three-page motion to dismiss, Docket No. 117, which again was accompanied by no memorandum or authority. The Court issued an amended scheduling order on November 3, 2015, setting a deadline for VWR's response to APT's initial motion to dismiss, Docket No. 114, and requesting clarification from as to whether the second motion to dismiss, Docket No. 117, was a distinct motion separate and apart from Docket No. 114. The Court did not receive such clarification. Rather, APT and Mr. Louisos

filed a "renewed motion to dismiss"—which included briefing—on November 12, 2015. Docket No. 123.

VWR moved strike the initial two motions to dismiss as procedurally defaulted under Local Rule 7.1(c), which requires that every non-contested motion be accompanied by a brief setting out the legal arguments and authority in support. Additionally, VWR argued that the renewed motion to dismiss ought to be stricken because the renewed motion would be time-barred under Rule 12(a)(1)(B), which requires a party to serve an answer to counterclaim within 21 days of service. APT and Mr. Louisos filed their motion to dismiss over three weeks after APT's deadline to respond and over two weeks after Mr. Louisos's deadline.

The Court discussed the various motions at the hearing on VWR's summary judgment motion. Giving the Counterclaim defendants the benefit of the doubt, it converted APT and Mr. Louisos's Motion to Dismiss to a Motion for Summary Judgment on February 3, 2016. Docket No. 162. The Court clearly outlined a briefing schedule in its Order converting the motion. The Court ordered any supplemental briefing to be filed by March 14, 2016 and stated without reservation that the Court would not accept any late filings. The Court acknowledged that while it had repeatedly overlooked late filings in the past, Counterclaim Defendants had thoroughly worn out their good will. In spite of this and numerous other admonitions, Counterclaim Defendants unapologetically flouted the supplemental briefing deadline and filed their supplemental brief and appendix late.

Even setting aside its lateness, VWR points out in its Motion for Relief Under the Court's February 3 and March 10, 2016 Orders, Docket No. 172, as well as its Response to Counterclaim Defendants' Supplemental Filing, Docket No. 177–78, that the Counterclaim Defendants' supplemental filing suffers tangible substantive inadequacies. The Court agrees. The

supplement does not cure the problems with the Counterclaim Defendants' original motion.

While the supplements purport to be in support of a motion for summary judgment, they merely

pays lip service to the different standard at play. In light of the APT and Mr. Louisos's repeated

disregard for deadlines and aversion to the needs for clarity throughout the litigation of this case

the Court will deny without prejudice the Counterclaim Defendants' various motions.

## IV.    CONCLUSION

For the reasons articulated above, the Court will grant VWR's motion for summary

judgment and deny or deem moot all remaining motions.

BY THE COURT:

GENE E.K. PRATTER
United States District Judge